**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anthony C. ZIZZO, James J. Marcello, Richard Gervasio, Anthony N. Chiaramonti, Brett K. O'Dell, and Samuel A. Carlisi, Defendants–Appellants.**

Nos. 95–1643, 95–1886, 95–3369, 95–3434, 95–4083 and 96–1762.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1997.

Decided July 29, 1997.

Marsha A. McClellan, Office of the United States Attorney, Criminal Division, Mark J. Vogel (argued), Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Robert S. Bailey, Cynthia Giacchetti (argued), Chicago, IL, Julius L. Echeles, Pompano Beach, FL, for Anthony C. Zizzo.

George N. Leighton (argued), Neal & Associates, John Thomas Moran, Jr., Chicago, IL, for James J. Marcello.

Terrence P. LeFevour (argued), Samuel V.P. Banks, Law Offices of Samuel V.P. Banks, Chicago, IL, for Richard Gervasio.

David G. Duggan (argued), Chicago, IL, for Anthony N. Chiaramonti.

Ralph E. Meczyk (argued), Chicago, IL, for Brett K. O'Dell.

Thomas P. Sullivan, Jenner & Block, Arthur N. Nasser (argued), Raymond J. Smith, Smith, Lodge & Schneider, Chicago, IL, Herbert Shafer, Atlanta, GA, for Samuel A. Carlisi.

Before BAUER, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In December 1992 a grand jury indicted eleven members of the Chicago Outfit, the Windy City's notorious crime syndicate, for their roles in the illegal gambling and loan-sharking operations of two of the Outfit's street-crew subdivisions. Two mobsters pled guilty and the rest of the indictees took their chances with a jury. All but one were convicted, and six appealed. After we consolidated their appeals, one of the defendants, Samuel "Wings" Carlisi, the Outfit's former boss of all bosses—a title once held by the likes of Al Capone and Tony "Big Tuna" Accardo—died. As we'll explain below, we vacate his conviction but affirm the convictions and sentences of the other defendants in all respects. First let's meet the cast of characters in this appeal.

The lion's share of the defendants below were members of the Carlisi Street Crew, an arm of the Outfit operating in western Cook and DuPage Counties throughout the 1980's. As the crew's name suggests, Carlisi— dubbed "Wings" in his youth for his unrivaled ability to elude the authorities while swiftly shuttling fellow gangsters from place to place—was the leader and financial backer of the group. James Marcello worked as Carlisi's chauffeur, emissary, and all-around right-hand man. Third in command was Anthony Zizzo. Known on the street as "Little

Tony," Zizzo supervised both Frank Bonavolante, the head of the crew's gambling operations, and Anthony "Big Tony" or "Tony the Hatch" Chiaramonti, who managed the crew's juice loan racket. The crew also employed a horde of other charming characters including Brett O'Dell, who helped Big Tony with the juice loan operation, and Richie Gervasio, who took bets for the crew and sometimes collected gambling debts.

It's a safe bet that the crew's decade-long, illegal gambling operation was its biggest moneymaker. Through an extensive network of "offices," which were often relocated to throw nosy government agents off of the trail, the crew took bets on professional sports and horse races. Just how lucrative was the crew's business? One of its bookies, Kenton "Kappy" Pielet, took in between $75,000 and $125,000 in wagers on an "average" weekend. And another office—one which cost over $500,000 to open—had a weekly payroll of around $30,000 and served a whopping 800 customers.

Because all bets, no matter how large, were accepted on credit, the crew prided itself on its effective debt-collection practices and held its bookies personally responsible for their customers' past-due accounts. Often the crew would dispatch muscle to threaten or rough up deadbeat debtors. For example, when a gambler named Anthony Pape failed to make good on his $15,000 gambling debt, Bonavolante let him know that "not even God was going to help" him. Another of Carlisi's heavies threatened to beat the completely bald Pape until his head turned so black and blue people would think he had hair. Pape eventually saved his scalp by persuading his father to cash in a $16,000 retirement annuity.

Another illustrative collection involved the debt of Michael Huber. After betting with crew bookies Kappy Pielet and Thomas Briscoe, Huber was referred to Gervasio, with whom he bet over $60,000 in an 18-month period. When Huber failed to make timely payments on a $2,500 losing wager, however, Gervasio revoked his betting privileges. After a series of meetings failed to resolve the matter, Gervasio sent Huber to the parking lot of a local restaurant, where he was grabbed, "tapped" in the face by two thugs, and told to return in a week with a payment. When Huber failed to report as directed, Gervasio explained that the matter would soon be out of his hands and Huber would be unwise to miss any more appointments. Huber made it to the next meeting; the money didn't. Less than pleased, one of the crew's enforcers checked Huber for a wire, choked him, and threatened to mess him up. Huber was so frightened that he defecated in his pants. Although Huber managed to steer clear of the crew for almost 2 years after that incident, an Outfit thug named Joe Cumbo later knocked on his door and sought to collect his debt. When Huber explained that he couldn't pay, Cumbo suggested that Huber sell his wife's car. Two days later someone threw a flare into the car, burning its backseat.

On other occasions the crew squeezed additional profits from its delinquent gamblers by referring them to Zizzo, Chiaramonti, and O'Dell for juice loans. For example, when gambler Frank Perri's favorite horse failed to outpace the other ponies and Perri couldn't cover his bet with Kappy Pielet, Chiaramonti and O'Dell graciously extended him a juice loan. When Perri failed to make a couple of his weekly interest payments, Pielet was forced to pay Zizzo on Perri's behalf. Unhappy about being left on the hook for Perri's past-due loan, Pielet asked O'Dell to look into the matter. O'Dell located Perri, slapped him in the face, and forced him to make a payment on his account.

Carlisi's men also made juice loans unrelated to its gambling operation. Unfortunately for the crew, one of its "business" juice loans was made to Anthony LaBarbera, a cooperating FBI witness. In 1988 LaBarbera needed money to purchase insurance and license plates for his trucking company. When he was unable to secure a bank loan, one of his employees, Vince Falzone, explained that he had worked for Zizzo and Chiaramonti and could check into a juice loan. True to his word, Falzone arranged for Chiaramonti to meet LaBarbera and loan him $5,000 (at the crew's normal annual interest rate of 260%). Chiaramonti instructed LaBarbera to drop off $250 in interest pay-

ments each week in envelopes addressed to "LT," a reference to Little Tony Zizzo. After making payments on the loan (often with cash fronted by the FBI) for 13 months, LaBarbera fell behind. Chiaramonti called him late at night, informed him that Zizzo was "hollering about the money being late," and warned LaBarbera to pay up "or else." In response, LaBarbera, who had once been choked by Chiaramonti for accusing Falzone of theft, explained that he was caught short when a customer failed to pay his trucking company. Chiaramonti then offered LaBarbera some keen practical advice. He explained LaBarbera had the "legal right to bust [the] head" of anyone who owed him money. Chiaramonti added, "When you got your foot on his throat then tell him now to go get my money."

With that cheery little picture of Carlisi's crew in mind, we turn our attention to the second Outfit subdivision whose activities are relevant to this case, a street crew controlled by infamous mobster Lenny Patrick. In 1986, when Carlisi took the reins as the head of the entire Outfit, the Patrick Street Crew came under his control, and Carlisi was able to call on Patrick's henchmen to help out with his own criminal chores.

One such undertaking involved an attempt to make Willis Johnson an offer he couldn't refuse. Johnson owned a chain of movie theaters and had been in a labor dispute with the projectionists union since 1983. In 1985 Johnson decided to automate projection at one of his cinemas, the Lake Theater. In early 1988, when negotiations with the union broke down, Johnson announced plans to automate all of his theaters. This didn't sit well with Carlisi, Marcello, and Zizzo, whose sons just happened to be card-carrying members of the projectionists union. As a result, Marcello contacted Patrick and explained that Carlisi wanted him to give Johnson "a little trouble" and make him "join the union."

Patrick assigned the task to his second in command, Mario Rainone, a skilled burglar who often branched out into more violent felonies. *See United States v. Rainone*, 32 F.3d 1203 (7th Cir.1994). Rainone in turn delegated the job to crew members James LaValley and Nicholas Gio. LaValley and Gio

decided the best way to make Johnson "join the union" was to torch the Lake Theater. Although they huffed and they puffed, LaValley and Gio just could not bring the theater down. First, they threw gasoline on the theater's roof and tried to light it with an incendiary grenade. They were unable to get the grenade onto the roof. Next they tried a Molotov cocktail. It, too, failed to do the trick. Figuring he would just have to do the job himself, Rainone, escorted by underling Albie Vena, threw a fragmentation grenade on the theater's roof. Alas, the third attempt at burning down the Lake Theater was simply not the charm. The grenade failed to detonate and was later found by a janitor, who promptly turned the dud over to the police.

In late 1989 the Carlisi crew assigned another task to a member of Patrick's crew. After Anthony "Jeep" Daddino, an Outfit street tax collector, was convicted of extorting cash from porn shops, he appeared ready to spill the beans on the crew's operation in order to shave a few months off of a potentially lengthy prison sentence. Hoping to nip any problem in the bud, Carlisi and Marcello decided to bump Daddino off. As Carlisi put it during a chat with Marcello and Patrick, "There is a million people gonna get hurt, including me, if we don't kill that Jeep." Marcello then met with Rainone and recruited him to pick the lock on Daddino's house (Daddino was out on bond pending sentencing) in order to let the hit men in. Marcello was even kind enough to lend Rainone a walkie-talkie to make sure the job went off without a hitch. When Rainone arrived at the scene, however, he became convinced that he—and not Daddino—was the real target of the hit. Despite Patrick's assurances that there was no contract out on him, Rainone began cooperating with the FBI in exchange for protection from the Outfit.

In addition to using Patrick's men for his own affairs, Carlisi financed the Patrick crew's juice loan operation. Through Marcello, he loaned Patrick $200,000. In return, Carlisi demanded repayment of his investment plus one-third of the profits from the loans. In order to protect his financial interests, Carlisi installed a trusted lieutenant,

"Singing Joe" Vento, as the head of Patrick's loan business. It proved to be a sound investment: Patrick steadily repaid the loan, and within 2 years the seed money had ballooned into $500,000.

Things started to go south for both crews in 1989. First, after incriminating himself in a taped conversation with Rainone, Patrick became the highest ranking Outfit member ever to turn state's evidence. A few months later another Patrick crew member, Gary Edwards, began cooperating with the FBI. When the Outfit got wind of that possible defection Vento ordered Patrick to shut down his loan operation. Despite the order, Patrick had Edwards funnel a $5,000 payment to Carlisi's crew through LaValley. LaValley gave the money to Zizzo, who confirmed that Patrick's debt was down to $26,000 and assured LaValley that he would pass the cash along to Marcello. Patrick and LaValley also persuaded Zizzo to overrule Vento's order and allow the crew to resume its loansharking activities. Finally, when LaValley was set to carry another payment to Zizzo, he heard that Edwards was cooperating with the FBI, became frightened, returned the money to Patrick, and called Zizzo to ask if he would be rubbed out for unwittingly aiding Edwards. Zizzo told LaValley not to worry and that he would let Marcello and Carlisi know of Edwards' defection.

In December 1992 a grand jury indicted Carlisi, Marcello, Zizzo, Chiaramonti, O'Dell, Gervasio, and five others for their roles in the Outfit's shady activities. About a dozen of the indictment's 27 counts are relevant to this appeal. Chief among them is Count One. It charged nine of the defendants with conspiring to conduct the affairs of the Carlisi Street Crew through a pattern of racketeering or the collection of unlawful debt, in violation of 18 U.S.C. § 1962(d), the federal RICO statute. The specific offenses underlying that conspiracy included arson, intimidation and murder conspiracies, running an illegal gambling business, as well as the making, financing, and collection of extortionate extensions of credit. Count Two charged all eleven defendants with operating an illegal gambling business in violation of 18 U.S.C. § 1955. Counts Three through Seven alleged that various defendants engaged in a number of extortionate credit transactions prohibited by 18 U.S.C. §§ 892–94. For example, Count Three charged Carlisi and Marcello with financing Patrick's juice loan operation. Counts Four and Five charged Zizzo and Chiaramonti with making and collecting extortionate extensions of credit, and Count Seven charged Gervasio with attempting to collect a debt through extortionate means. The remaining relevant counts charged Chiaramonti and O'Dell with willful failure to file tax returns.

Two of the defendants pled guilty; the others opted for their day in court. After a 10½–week trial, a jury convicted eight of them. Only Joseph Braccio, a restauranteur accused of allowing the crew to use his establishment to cover up its shady activities, was acquitted. Carlisi, Marcello, Zizzo, Chiaramonti, Gervasio, and O'Dell appealed, and we consolidated their cases in this proceeding. We consider Carlisi's appeal first.

■ After his appeal had been fully briefed, Carlisi, then 75 and in failing health, died. His death raises two issues. The first relates to his conviction. Because Carlisi died before we were able to decide his appeal on the merits, his conviction abates. *United States v. Moehlenkamp,* 557 F.2d 126 (7th Cir.1977). We therefore remand the appeal in case No. 96–1762 to the district court with instructions to vacate Carlisi's convictions and dismiss the outstanding indictment as to him.

■ The second issue is more interesting. Before he died, Carlisi paid a $50,000 fine, $450 in special assessments, and $9,115 to cover the bills racked up by the government in prosecuting him on the tax counts. Pursuant to an agreement also signed by Marcello, Zizzo, and Chiaramonti, Carlisi additionally chipped in $137,500 to cover his share of a stipulated criminal forfeiture. Stressing that Carlisi's conviction abates *ab initio,* his attorney claims that all monies paid before Carlisi's demise should be refunded to his estate.

We are not persuaded. The fine and assessments served to deprive Carlisi—who the district judge, Paul E. Plunkett, noted had used bombs, beatings, and murder to in-

crease his profits—of some of his resources during his lifetime. They are analogous to time served and are not refundable. *United States v. Schumann,* 861 F.2d 1234, 1236 (11th Cir.1988); *United States v. Bowler,* 537 F.Supp. 933, 936 n. 5 (N.D.Ill.1982) (Flaum, J.) (citing *United States v. Morton,* 635 F.2d 723, 725 (8th Cir.1980)); *see also United States v. Asset,* 990 F.2d 208, 214 (5th Cir. 1993) ("The rule of abatement has never been applied to require the return of money paid by a defendant prior to his death and has, in fact, been held inapplicable to fines—obviously penal—paid by a defendant before his death."). And although a lone district court has gone the other way, *see United States v. Sheehan,* 874 F.Supp. 31 (D.Mass. 1994), we see no reason to cast aside the conclusion of every other circuit and district court to have addressed this issue. *Sheehan* downplayed the immediate punitive purpose of fines and assessments paid before death, was unable to rationalize its holding with the fact that the other effects of a conviction, such as time served, could not be erased by a defendant's death, and raised an unrealistic fear that the nonabatement of paid fines will lead savvy convicted felons to avoid paying their fines in a timely manner in case they die before their appeals are heard.

Carlisi is also out of luck on the costs of prosecution, which served both to deprive him of some of his illegal profits during his lifetime and compensate the government as the victim of his tax offenses. *See Asset,* 990 F.2d at 213; *United States v. Dudley,* 739 F.2d 175, 178 (4th Cir.1984). The criminal forfeiture is also not refundable. Like the paid fine and assessments, it served to strip away a small fraction of the millions of dollars Carlisi raked in from his illegal activities. Finally, the agreement signed by Carlisi made clear that even if he won his appeal, he was not entitled to a refund of his share of the forfeiture unless Marcello, Zizzo, and Chiaramonti also prevailed. Because we (as is explained below) affirm their convictions, the forfeiture agreement also bars a refund of Carlisi's $137,500 payment.

■ With Carlisi's appeal behind us, we turn to four issues raised by the defendants' consolidated brief. Their first common tar-

get is Lenny Patrick, the government's star witness and a lifelong criminal once accused by Cuban television of playing a lead role in the Kennedy assassination. Citing Patrick's admitted history of crime, deceit, and perjury, the defendants claim the district court should not have allowed him to testify during the trial without first ordering a psychiatric exam. The defendants also stress that during cross-examination Patrick was asked, "The oath doesn't really mean anything to you, does it?" and he replied, "No, it don't." Based on that exchange, the defendants assert Patrick renounced his oath to testify truthfully and the district court should have excluded his entire testimony.

■ Whether a witness should be forced to endure a psychiatric examination before being allowed to testify is a matter best left to the discretion of the district court. *United States v. Tucker,* 773 F.2d 136, 140 (7th Cir.1985). There was certainly no abuse of that discretion here. Although Patrick had perjured himself in other proceedings, even the most dastardly scoundrels, cheats, and liars are generally competent to testify. *See* Fed.R.Evid. 601. And while a district court has the authority—to be used sparingly—to order a psychiatric evaluation when a prospective witness displays "definite indications of serious mental illness," *United States v. Gutman,* 725 F.2d 417, 420 (7th Cir.1984), the defendants have pointed to absolutely no evidence suggesting that Patrick displayed signs of mental illness at the time he testified. Rather than rendering him incompetent to testify without some sort of psychiatric examination, Patrick's penchant for perjury simply provided the defense with an ample opportunity to undermine his credibility on cross-examination.

■ The defendants made the most of that opportunity. During the heat of a lengthy cross-examination—it covers over 400 pages of the trial transcript—Patrick stated, as we noted, that the oath to testify truthfully meant nothing to him. The defendants argue Patrick's shocking revelation rendered him an unsworn witness, whose entire testimony should have been thrown out, *sua sponte,* by Judge Plunkett. Because this issue was not raised below, we will reverse

only if we find plain error. *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

We detect no error in the district court's failure to strike Patrick's testimony. Federal Rule of Evidence 603 requires every witness to swear or affirm that he will tell the truth. The idea behind the rule is to preserve the integrity of the judicial process by awakening the witness' conscience and making the witness amenable to perjury prosecution if he fibs. In this case Patrick swore to tell the truth and repeatedly acknowledged the district judge's admonishments that he was under oath. Patrick was also aware of the consequences of perjury. In 1991 he agreed to testify against the Outfit in exchange for a reduced sentence of 6 years. A year later Patrick perjured himself while testifying against Carlisi in a federal case in California. In the wake of that perjury, which led to Carlisi's acquittal, the government sought to revoke Patrick's plea agreement and have 3 more years tacked onto his sentence. A district judge agreed that an increase was warranted but found that an extra 12 months would do the trick. Patrick, who was nearly 80 years old at the time, called the additional year a "death sentence." Given that experience, Patrick certainly knew that if he lied in this case, his sentence could be jacked up again and he would likely die behind bars. It follows, then, that his single remark on cross-examination did not require the district judge to *sua sponte* strike his entire 3–days' worth of testimony.

■ The second argument outlined in the defendants' consolidated brief is that the district court erred by allowing the jury to hear Mario Rainone's end of conversations he taped with unindicted coconspirators Patrick, Vento, and LaValley. The conversations at issue covered four topics: the Daddino murder conspiracy; the alleged plot to kill Rainone; Carlisi's investment in Patrick's crew; and the details of Patrick's loan business. Because Rainone was no longer a member of the conspiracy, but instead a cooperating government agent at the time he made the tapes, the defendants claim his statements do not fit within the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E).

While the defendants' interpretation of Rule 801(d)(2)(E) is certainly on target, their argument generally misses the mark. The district court admitted only the statements made by Patrick, Vento, and LaValley under that exception. Rainone's remarks on the other hand were not admitted for their truth but rather to give *context* to the conspirators' ends of the conversations. That was certainly a permissible move. *See United States v. Plescia,* 48 F.3d 1452, 1463 (7th Cir.), *cert. denied sub nom. Bonavolante v. United States,* 116 S.Ct. 351 (1995); *Lee v. McCaughtry,* 892 F.2d 1318, 1324–25 (7th Cir.1990) (citing *United States v. Davis,* 890 F.2d 1373, 1380 (7th Cir.1989) (collecting cases)). The district court properly instructed the jury that nothing Rainone said could be used to prove the truth of the matter asserted and that the parties had stipulated there had been no plot to rub out Rainone. We presume the jury followed those instructions. *United States v. Butler,* 71 F.3d 243, 252 (7th Cir.1995). Finally, we note that the district court was careful to keep out Rainone's statements which failed to elicit any response and admit only those which the coconspirators were in a position to deny or adopt based on information they had learned from sources other than Rainone.

The defendants next allege that their hopes for a fair trial were dashed when the district court refused to remove a pair of biased jurors. The defendants' argument centers on two incidents. The first occurred during a lunch break on October 5, 1993, the first full day evidence was presented in the case. A juror named Scholtens saw defendant O'Dell in the cafeteria in the Dirksen Federal Building. Scholtens noticed that O'Dell had something strapped to the side of his leg, thought it might have been a weapon, and alerted the court's staff. As it turns out, O'Dell was out on bond and wearing an electronic monitoring device. After conferring with the parties, the district judge called Scholtens into chambers, questioned him, and informed him that the device O'Dell was wearing was for his own well-being and had nothing to do with a weapon. Based on Scholtens' answers and demeanor, Judge

Plunkett determined that he could still function as an impartial juror.

Over 3 weeks later, on October 23, 1993, Judge Plunkett was walking into his chambers when an alternate juror named Zichterman mentioned that he wished he had been wearing a body recorder at lunch. Zichterman explained that he had been sitting near some of the defendants in the cafeteria and heard one of them mention "30 or 40 or $50,000 or something." The judge stopped him from saying anything more and called in the defendants' attorneys. All agreed that Zichterman should be questioned. In chambers Zichterman stated that he heard some of the defendants talking about large amounts of money and figured that they were probably talking about bets placed on a recent Monday Night Football game involving the Chicago Bears.[1] Zichterman also stated that he mentioned the conversation to a couple of other jurors. Judge Plunkett investigated the matter and learned that Zichterman had passed word of the incident to jurors Huemmer and Scholtens. After questioning the three jurors individually, the court excused Zichterman from the panel but allowed Huemmer and Scholtens to remain. The defendants argue the judge should have sent Huemmer and Scholtens packing as well and then should have questioned the entire panel about the matter.

■ We review the district court's decisions regarding allegations of prejudicial juror contact for an abuse of discretion, *United States v. Best*, 939 F.2d 425, 429 (7th Cir. 1991) (en banc), and will reverse only for "manifest error." *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). The district court's conclusion that Huemmer and Scholtens could still discharge their duties as jurors was a far cry from an abuse of discretion. The defendants make much—too much—of the fact that when asked whether he still presumed the defendants innocent, Huemmer replied "Well, I'll put it this way. They are having their day in court. The prosecution is building a case." We do not see this as the clearcut evidence of bias that the defendants claim it to be. Hu-

emmer did not state that he no longer presumed the defendants innocent or that the government had already made its case; he simply stated that the prosecution was building a case. As Judge Plunkett noted, that was certainly a fair assessment since the government had been presenting evidence for over 3 weeks at that point. In addition, Huemmer's reply must be read in its proper context. When first asked what Zichterman told him, Huemmer replied that he had heard the defendants had been discussing large numbers. Huemmer added that he didn't think the conversation had anything to do with the trial and for all he knew, "they could have been talking about jelly beans." Huemmer stated that he could still be impartial and knew that there was still a lot of evidence to be presented. Based on his answers and demeanor, Judge Plunkett did not abuse his discretion when he concluded that Huemmer could still function as an unbiased juror. We also see no problem with the decision to keep Scholtens on the panel. He agreed that the defendants' conversation was probably taken out of context and stated that he would have no problem basing his decision solely on the trial evidence. There is simply no indication that Scholtens—even when we factor in his earlier concern about O'Dell's legband—was biased against the defense.

■ We also find no abuse of discretion in the district court's decision not to ask each of the jurors whether they had heard of the defendants' lunchtime chat. When defendant Joe Bonavolante's counsel made that request below, it was opposed by Braccio's attorney and later withdrawn. It would seem, then, that the issue has been waived. However, even were we to consider the argument on the merits, we can find neither an error nor prejudice here. Questioning each juror would likely have "compound[ed]" the problem by drawing attention to it," *United States v. Carson*, 9 F.3d 576, 590 (7th Cir. 1993), and any claim of prejudice is undercut by the fact that the jury ended up acquitting Braccio, one of the defendants involved in the conversation. *United States v. Sanders*, 962 F.2d 660, 673–74 (7th Cir.1992).

---

1. The Bears lost to the Minnesota Vikings by a touchdown on Monday, October 25, 1993; six days later they were drubbed by the Green Bay Packers, 17 to 3.

▮ The final argument raised by all five defendants is a constitutional challenge to 18 U.S.C. § 1955, which makes it a federal crime to run a gambling business of a certain size where prohibited by state or local law. Relying on *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the defendants assert that Congress overstepped its Commerce Clause authority in enacting § 1955. They also contend that the statute is unconstitutional as applied to their "purely local" operation.[2]

Neither argument carries the day. Under the Commerce Clause, Congress has the power to regulate three broad categories of activity: the use of the channels of interstate commerce; the protection of the instrumentalities of interstate commerce or persons or things in interstate commerce; and activities that substantially affect interstate commerce. *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971); *Lopez*, 514 U.S. at 558–59, 115 S.Ct. at 1629–30. In *Lopez* the Supreme Court addressed the third category of permissible regulation and determined that in enacting 18 U.S.C. § 922(q), the Gun–Free School Zones Act, Congress exceeded the "outer limits" of its Commerce Clause power. The Court reasoned that § 922(q), which made it a federal offense to carry a gun near a school, had "nothing to do with 'commerce' or any sort of economic enterprise," contained no jurisdictional element to tie the possession of a particular gun to interstate commerce, and did not contain legislative findings which would enable the Court to evaluate Congress' judgment. *Id.* at 561–63, 115 S.Ct. at 1630–32.

Section 1955 stands in sharp contrast to the Gun–Free School Zones Act. First, § 1955 has a commercial aspect. It prohibits illegal gambling *businesses*. To fall within the statute's reach, an illegal gambling operation must involve "five or more persons who conduct, finance, manage, supervise, direct,

or own all or part of such business[.]" The business must also have been in substantially continuous operation for over 30 days or have generated gross revenue of $2,000 in any single day. Second, although § 1955 does not contain an explicit jurisdictional element, Congress supported the statute with extensive findings outlining the significant impact large-scale, illegal gambling operations can have on interstate commerce. Congress found that illegal gambling fills the coffers of organized crime, which in turn has a substantial effect on interstate commerce. *See United States v. Sacco*, 491 F.2d 995, 998–1001 (9th Cir.1974) (discussing Congress' findings); *see also United States v. Wall*, 92 F.3d 1444, 1450 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997) (rejecting *Lopez* challenge to § 1955 and upholding congressional findings linking illegal gambling to interstate commerce); *United States v. Cleveland*, 951 F.Supp. 1249, 1255–56 (E.D.La.1997) (same). In rejecting pre-*Lopez* challenges to § 1955, we concluded that these findings were rational. *See United States v. Hunter*, 478 F.2d 1019, 1021 (7th Cir.1973).

We see no reason to retreat from that position. First, our decision in *Hunter* was based largely upon *Perez*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686. In *Perez* the Court upheld the constitutionality of 18 U.S.C. § 894, which prohibits collecting an extension of credit through extortionate means. The Court concluded that Congress had rationally found that even purely intrastate loansharking operations substantially affect interstate commerce because they often provide revenue for organized crime. *Id.* at 155–57, 91 S.Ct. at 1362–63. *Lopez* did not undercut *Perez*'s reasoning or holding. Rather, *Lopez* cites *Perez*, an example of the appropriate use of Congress' commerce clause power. *See* 514 U.S. at 559, 115 S.Ct. at 1629–30.[3]

---

**2.** The defendants also suggest § 1955 violates the Constitution's Equal Protection Clause because it applies only to citizens who live in states where it is illegal to run a gambling business. This argument has been "definitively refuted." *United States v. Balistrieri*, 779 F.2d 1191, 1224 (7th Cir.1985). Despite an obligation to do so, the

defendants fail to cite—let alone distinguish—*Balistrieri*.

**3.** Because *Lopez* cited *Perez* with approval, we also reject Chiaramonti's constitutional challenges to his extortionate credit transaction convictions under 18 U.S.C. §§ 892–94.

Second, this case illustrates that the congressional findings attached to § 1955 were on target. The Carlisi crew's gambling profits certainly funded additional organized crime activity (including Patrick's loansharking operation), and the Outfit surely had its thumb in many pies which affected interstate commerce. In fact, the crew's gambling business alone involved an extensive network of offices, one of which cost $500,000 to open, served 800 betting customers, had a weekly payroll of $20,000 to $30,000, and accepted $80,000 in wagers in a single week. And in addition to paying its employees' salaries, the crew had to shell out for rent, phone service, utilities, pagers, and sports journals printed out of state. Given that a single gambling office had some effect on interstate commerce, Congress was certainly entitled to conclude that organized crime, when considered as a whole, substantially affects interstate commerce.

■■■ We also reject the defendants' claim that § 1955 cannot constitutionally apply to their "purely local" operation. This argument misses the point. As we have already mentioned, Congress has the authority to regulate intrastate activities which, taken in the aggregate, have a substantial effect on interstate commerce. *Lopez*, 514 U.S. at 559, 115 S.Ct. at 1629–30; *Perez*, 402 U.S. at 154, 91 S.Ct. at 1361–62 ("Where the *class of activities* is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class.") (emphasis in original). Based on Congress' findings that loansharking—as a class of activity—was linked to organized crime, *Perez* held that even intrastate loansharking operations fall within Congress' Commerce Clause power. Because Congress rationally determined that large-scale illegal gambling operations are also often tied to organized crime, we can safely conclude that § 1955 properly reaches even "purely local" gambling businesses. *Accord Wall*, 92 F.3d at 1450–51 n. 14; *Cleveland*, 951 F.Supp. at 1256–57.

We turn now to the conviction-related arguments raised by the individual defendants. Because many of the approximately three dozen issues outlined in their briefs clearly go nowhere, we will address only their better arguments. To the extent their claims are not discussed in this opinion, they have been determined to lack merit and are hereby dismissed.

■■■ We first address a number of their challenges to district court's evidentiary rulings, all of which we review only for an abuse of discretion. *United States v. Williams*, 106 F.3d 1362, 1366 (7th Cir.1997). Because Marcello is the highest ranking defendant left in the case, and in the Outfit rank has its privileges, we'll consider his arguments first.

■■■ Marcello believes the district court erred in refusing to admit four statements from other cases, in which the prosecutors handling this trial called Mario Rainone and Lenny Patrick liars. The first three were made in the course of prosecuting Rainone. In that case, the government: (1) submitted a memo to the probation office dubbing Rainone "an inveterate and unrepentant liar"; (2) sent Rainone's attorney a letter stating that Rainone was "unworthy of belief"; and (3) argued to the court that Rainone was a liar. The fourth statement, regarding Patrick, was made during a hearing on the government's motion to revoke his plea agreement following his perjury in the California case against Carlisi. The prosecutors simply argued to the court that Patrick's testimony would be more difficult to sell to juries in future Outfit trials. Marcello thinks that all four opinions are classic examples of admissions of a party-opponent covered by Federal Rule of Evidence 801(d)(2)(D).

Judge Plunkett did not abuse his discretion in keeping the statements out. For even if Marcello could convince us that the statements qualified as nonhearsay under Rule 801(d)(2)(D),[4] the judge cited a number of

---

4. Based on the common law principle that no individual should be able to bind the sovereign, we generally decline to apply Rule 801(d)(2) to statements made by government employees in criminal cases. *See United States v. Prevatte*, 16 F.3d 767, 779 n. 9 (7th Cir.1994). We note, however, that a number of courts have rejected that approach when dealing with statements made by government attorneys. *See e.g., United States v. Kattar*, 840 F.2d 118, 130 (1st Cir.1988)

reasons why he felt the statements should be excluded, any one of which supports his exercise of discretion. For example, the defendants sought to admit the statements calling Rainone a liar in order to impeach his credibility as a nontestifying declarant under Rule 806. Specifically, the defendants hoped to show that Rainone lied when talking with LaValley and Patrick. However, the judge noted that even if the defendants were careful not to use the prosecutors' statements to impermissibly attack the government—a danger which alone could justify excluding the statements under Rule 403—the opinions in question would likely mislead the jury. The judge reasoned because the opinions were based only on Rainone's tendency to mix fact and fiction when describing Outfit activities to the prosecutors, they did not shed any light on whether Rainone lied during his earlier dealings with his mob pals. In addition, the judge noted that whether a prosecutor believes a witness is irrelevant and, if argued to the jury, reversible error. *See United States v. Dotson,* 799 F.2d 189, 194 (5th Cir.1986). Finally, the district court reasonably found that the need to introduce this evidence was far from compelling since the government's own star witnesses—Patrick and LaValley—had already testified that Rainone lied on a regular basis.

We reach the same result on the prosecutors' opinion that Patrick's perjury would make his testimony a tough sell in future Outfit cases. As the judge noted, this opinion would not serve to help the jury in any way (a prerequisite for admission under Rule 701) and was cumulative to Patrick's own testimony.[5] After all, he readily admitted he had testified falsely in the California case. We also fail to see how the defendants planned to get around Rule 608(b), which precludes the admission of extrinsic evidence of a witness' lying ways.

("Whether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, the Justice Department certainly should be considered such.") (citations omitted); *United States v. Morgan,* 581 F.2d 933, 938 (D.C.Cir.1978) (government cannot object to a statement as hearsay when its attorneys have already sworn that the statements are trustworthy).

Zizzo is up next. He claims the district court erred in admitting Vince Falzone's statements under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). In support, Zizzo points to an affidavit, submitted in support of his post-trial motions, in which Falzone (unsurprisingly) declares that he was not involved with the Carlisi crew and that his talks with LaBarbera only repeated "barroom scuttlebutt."

In order to admit the statements under Rule 801(d)(2)(E) the district court had to find: a conspiracy existed; Falzone and Zizzo were members of that conspiracy; and Falzone's statements furthered the conspiracy's objectives. *United States v. Godinez,* 110 F.3d 448, 454 (7th Cir.1997); *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The district court did not clearly err in finding that Falzone's statements satisfied *Bourjaily.* First, the evidence sufficiently showed that Falzone, Chiaramonti and Zizzo were coconspirators. Falzone's own statements, which we of course may consider when determining whether a conspiracy existed, *Godinez,* 110 F.3d at 454–55, made clear that he had worked first for Zizzo's father (who once ran the Northern Indiana branch of the Outfit's gambling business) and later for Zizzo and Chiaramonti in juice loan activity. Falzone's claims were corroborated by independent evidence. For example, at a meeting arranged and attended by Falzone, Chiaramonti told LaBarbera that he could speak freely about his juice loan because Falzone "knows my business." In addition, Falzone told LaBarbera that Zizzo would have a say on whether his loan was approved and later claimed to have been present when Chiaramonti handed Zizzo a $1,000 payment from LaBarbera. Because Falzone's statements (despite his later self-serving affidavit to the contrary) were supported by independent evidence, we conclude that the district judge did not err in

5. The government also argues allowing this opinion into evidence would have opened the door to the admission of evidence that a federal district judge had found that Patrick testified truthfully against Outfit boss Gus Alex.

finding that Falzone and Zizzo were coconspirators.

Second, the district court did not clearly err in finding that Falzone's statements furthered the conspiracy. Falzone's statements "need not have been made exclusively, or even primarily, to further the conspiracy." *United States v. Powers*, 75 F.3d 335, 340 (7th Cir.1996). Rather, the only question is whether "some reasonable basis" exists for concluding that his chats with LaBarbera were intended to move the conspiracy closer to its objectives. *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir.1987) (citing *United States v. Mackey*, 571 F.2d 376, 383 (7th Cir.1978)). When LaBarbera needed money for his trucking business, Falzone explained that he worked for Chiaramonti and Zizzo, who controlled all loan activity on the streets of Chicago, and could help LaBarbera obtain a loan. Falzone then set up a meeting with Chiaramonti and encouraged LaBarbera, who needed only $2,000, to borrow at least $5,000. Finally, Falzone warned LaBarbera to keep up on his payments if he wanted to steer clear of trouble with Chiaramonti and Zizzo. Those statements and actions sufficiently support the district court's determination that one purpose of Falzone's remarks was to inform a potential borrower of the procedures for obtaining a juice loan, explain the crew's collection practices, and increase the conspiracy's profits by prompting the borrower to take out as large a loan as possible.

■ Chiaramonti also raises a bunch of evidentiary challenges. Big Tony's big argument is that the district court erred by admitting testimony regarding his past violent acts and reputation for violent conduct. For example, after instructing the jury that the statements were not to be used for their truth but rather only to show LaBarbera's state of mind, the trial court allowed LaBarbera to testify about three conversations he had regarding Chiaramonti. LaBarbera stated that his friend Diane Cutler, his employee Mary Rice (who as fate would have it was a close friend of Big Tony), and "Jeep" Daddino individually warned him not to upset Chiaramonti because he was very dangerous. Second, the jury was allowed to hear two of

Falzone's taped statements to LaBarbera. One of the statements was admitted for its truth under Rule 801(d)(2)(E) and described Chiaramonti's supervisory role in the Carlisi juice loan operation. The other, admitted only to show LaBarbera's state of mind, recounted how Big Tony, who owned a limousine rental agency, had severely beaten one of his drivers after catching him running prostitutes out of company cars. Third, the jury was allowed to listen to a number of Chiaramonti's own statements to LaBarbera. For example, Chiaramonti stated that he disciplined his son by hitting him with a "backhand" to the mouth, giving him "a boot in [the] ass" and treating him "like a motherfucking stranger." Chiaramonti added that his son had seen him "work on different guys ... at the race track." The jury also heard Chiaramonti advise LaBarbera, as we noted earlier, that he had the "legal right to bust [the] head" of anyone who owed him money. Finally, LaBarbera was allowed to testify that after he had accused Falzone of theft, Chiaramonti, who didn't believe the allegations, choked LaBarbera and threatened to "fuckin' shoot" him, "break [his] fuckin' head," "bury" him, and "fuckin' knock [his] head off." Chiaramonti also threatened to put LaBarbera, who had a serious heart condition, "right back in the hospital." LaBarbera was so scared that he avoided Big Tony by having undercover FBI agents drop off his next few juice loan payments.

■ The district judge did not abuse his discretion in admitting these statements for the limited purpose of showing what LaBarbera understood and believed. In Count Four Chiaramonti was charged with making an extortionate extension of credit (the LaBarbera loan) under 18 U.S.C. § 892. That charge required the government to prove that Big Tony and LaBarbera had an understanding that failure to repay the loan in a timely fashion "could result in the use of violence or other criminal means to cause harm to" LaBarbera. 18 U.S.C. § 891(6). The term "understanding" does not mean that the government needed to show that a mutual agreement was reached. Rather, the statute only requires that both parties "comprehended" that a threat of violence existed.

*United States v. Annoreno*, 460 F.2d 1303, 1308–09 (7th Cir.1972); accord *United States v. Dennis*, 625 F.2d 782, 803 (8th Cir.1980); *United States v. DeVincent*, 546 F.2d 452, 455 n. 1 (1st Cir.1976). As a result, it was not an abuse of discretion for the district judge—who reasonably applied Rule 403's balancing test and gave the jury proper limiting instructions—to admit evidence bearing on LaBarbera's understanding of the juice loan.

This is true even though none of the "state of mind" evidence was directly linked to the loan. *E.g., United States v. Oreto*, 37 F.3d 739, 749–50 (1st Cir.1994) (juice loan borrower allowed to testify that he knew the defendant had "got out of jail for murder" even though the conviction had nothing to do with loansharking); *DeVincent*, 546 F.2d at 452, 456–57 (testimony regarding loansharking defendant's 20–year–old armed robbery conviction and 10–year–old murder indictment properly admitted to show debtor's state of mind). After all, Chiaramonti's reputation for violence and his connection to the Outfit surely shaped LaBarbera's understanding that he could be roughed up if he failed to repay his juice loan. *See United States v. Zannino*, 895 F.2d 1, 11 (1st Cir.1990) (jury properly allowed to consider defendant's nexus to organized crime when evaluating a debtor's understanding).

■ And despite Chiaramonti's protests to the contrary, admission of this type of testimony is not conditioned on the unavailability of a juice loan debtor. *Oreto*, 37 F.3d at 750; *Dennis*, 625 F.2d at 801; *see also United States v. DeVincent*, 632 F.2d 147, 150 (1st Cir.1980). Although § 892(c) provides that if evidence of a juice loan debtor's actual belief is unavailable the district court may admit reputation evidence "as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension" of credit, that provision does not bar evidence of prior bad acts, admissible under Rule 404(b) "when offered

to show the basis for a victim's fear." *Oreto*, 37 F.3d at 750. Section 892(c) simply allows the receipt of reputation evidence—often otherwise inadmissible—when a juice loan debtor's direct testimony is unavailable. For example, had LaBarbera been unable to testify, the government could have attempted to use § 892(c) to admit testimony from coconspirators such as James Palaggi—to whom Chiaramonti had once bragged that he extorted a juice loan payment by placing a delinquent debtor on a hot restaurant griddle—even though LaBarbera had never heard of the incident.[6]

■ We likewise find no merit in Chiaramonti's suggestion that admission of the challenged evidence violated the Confrontation Clause. Chiaramonti's own statements, admitted under Rule 801(d)(2)(A), obviously pose no problem. Falzone's statements, to the extent they were admitted for their truth under Rule 801(d)(2)(E), likewise did not interfere with Chiaramonti's confrontation rights. *Bourjaily*, 483 U.S. at 182–83, 107 S.Ct. at 2782–83. Finally, because the jury was properly instructed not to consider the remaining statements for their truth, we reach the same result on the "state of mind" evidence. *See Lee*, 892 F.2d at 1326.

O'Dell is up next. He believes the district court ignored Federal Rule of Evidence 404(b) and improperly allowed the government to admit evidence of a number of his prior bad acts in order to sully his character. O'Dell specifically complains that the court should not have allowed testimony showing that he: (1) made and used extortionate means to collect a juice loan to a borrower named Ilcho Yovanof; (2) vandalized a barbershop with Chiaramonti in 1975; (3) served as Chiaramonti's lookout for a jewelry store burglary in 1979; (4) sold a load of stolen tires in 1987; and (5) failed to file tax returns in years predating those listed in the indictment.

---

**6.** Apparently Chiaramonti thinks this evidence did come in under § 892(c). He argues that the district court impermissibly allowed Palaggi's testimony as well as that of coconspirators Saverio Musillami and Kappy Pielet without first showing that LaBarbera's testimony was unavail-

able. None of the coconspirators' testimony was received under § 892(c). Rather, their testimony was admitted as direct, relevant evidence of the racketeering activities underlying the RICO conspiracy.

O'Dell's argument misses the mark. With one exception, the testimony cited above did not come in under 404(b). Testimony about the Yovanof loan was properly allowed as evidence of an additional act underlying the RICO conspiracy. The evidence relating to the barbershop vandalism and jewelry store burglary was either excluded from or never even offered during the government's case. The court only allowed testimony on those events after O'Dell "opened the door" by claiming on direct that he never had any criminal relationship with Chiaramonti. That was not an abuse of discretion. *See e.g., United States v. Saadeh,* 61 F.3d 510, 522 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995); *Prevatte,* 16 F.3d at 776–77 n. 8. Testimony concerning the stolen tires was likewise only brought out on cross. O'Dell never objected, and because the incident was probative of his truthfulness, the district court did not plainly err in admitting the testimony. *United States v. Smith,* 80 F.3d 1188, 1193 (7th Cir.1996) (defendant's prior thefts proper topic for cross-examination under Rule 608(b)). Finally, although the court did admit (without objection) evidence of O'Dell's failure to file tax returns in years prior to those charged in the indictment under 404(b), we can find no error, let alone a plain one. O'Dell was charged with willful failure to file tax returns under I.R.C. § 7203. His failure to file in earlier years was relevant to his specific intent. *United States v. Kalita,* 712 F.2d 1122, 1130–31 (7th Cir.1983); *United States v. Serlin,* 707 F.2d 953, 959 (7th Cir.1983).

O'Dell mounts one other evidentiary challenge. After Carlisi was arrested he told federal agents that he knew Marcello, Zizzo, and Chiaramonti but had never heard of the others named in the indictment. O'Dell thinks that statement would have shown the jury that he was not mixed up with the Carlisi crew. He maintains that the district court abused its discretion in declining to admit Carlisi's remarks either as statement against interest under Rule 804(b)(3) or as an excited utterance under Rule 803(2).

Neither argument goes far. We apply a three-step test to determine whether a statement qualifies for admission under Rule 804(b)(3): (1) the statement must be against the declarant's penal interest; (2) corroborating circumstances must clearly establish the statement's trust-worthiness; and (3) the declarant must be unavailable to testify. *Butler,* 71 F.3d at 252. O'Dell can't get over the first hump. He has not shown how Carlisi's statement could be construed as against his penal interest. A simple remark that he only knew three of his codefendants did not tend to subject Carlisi to criminal liability.

Yet another three-part test spells doom for O'Dell's excited-utterance theory. Rule 803(2) comes into play only when (1) a startling event occurs; (2) the declarant makes a statement while under the stress and excitement caused by the event; and (3) the statement relates to the startling event. *United States v. Sowa,* 34 F.3d 447, 453 (7th Cir.1994). Even were we to assume that Carlisi's arrest at O'Hare airport qualified as a "startling event," O'Dell's claim bogs down on step two. That is, he cannot show that by the time Carlisi arrived at the Dirksen Building in downtown Chicago he was still in such an excited state as to exclude "the possibility of conscious reflection." *United States v. Moore,* 791 F.2d 566, 571–72 (7th Cir.1986). On the contrary, the federal agents who interviewed Carlisi described Carlisi as calm and collected.

Finally, Gervasio claims the district court erred by allowing Michael Huber to testify about Joe Cumbo's attempt to collect his debt to the crew. Gervasio argues because nothing links him to Cumbo's later collection efforts, the prejudicial effect of Huber's testimony about Cumbo substantially outweighed its probative value. *See* Rule 403. Gervasio asserts this error was compounded by the decision to allow the jury to see pictures of the backseat of Huber's wife's car, which had been mysteriously burned just 2 days after Cumbo suggested that Huber sell the car to pay off his debt.

The district judge felt that although the link was not strong there was a connection between Cumbo and Gervasio. As a result he allowed Huber to testify about Cumbo's

collection efforts. That was not an abuse of discretion. Cumbo told Huber that he was trying to collect a debt which traced back to Briscoe. Briscoe had already testified that Gervasio collected his debts for the crew. Although the jury *later* chose not to credit some of Briscoe's testimony—the jury's special verdict rejected the idea that Gervasio agreed to collect gambling debts for Briscoe—there was certainly a sufficient basis, at the time the judge allowed Huber to testify, to link Cumbo to Gervasio. As for the pictures of the car, when Carlisi objected to their admission Judge Plunkett responded, "Really? They're just pictures of a seat." As the judge's comment suggests, the pictures were not inflammatory or misleading, so it does not strike us as an abuse of discretion to let the jury have a look at them.

 Having found no reason to second-guess the district court's evidentiary rulings, we turn to the rest of the defendants' conviction-related arguments, most of which attack the sufficiency of the evidence. In ruling on those challenges we view the facts in the light most favorable to the government and will reverse only if no reasonable juror could have found the defendant guilty beyond a reasonable doubt. *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir.1996). As before, Marcello gets to go first.

Only one of his claims merits discussion. Marcello argues his various Rule 29 motions for acquittal should have been granted. His argument is somewhat puzzling. Although the jury found that he had agreed to six of the racketeering acts underlying the RICO conspiracy, Marcello challenges the jury's findings on only two: the conspiracy to intimidate Willis Johnson and the plot to murder "Jeep" Daddino. Because he does not challenge the sufficiency of the evidence proving that he agreed to commit the other four racketeering acts, it would seem that his conviction on Count One would remain intact regardless of whether the jury credited his involvement in the Lake Theater and Daddino events. Marcello tries to get around this little snag by suggesting the district court's failure to grant him "an acquittal" on those acts improperly allowed the jurors to consider highly prejudicial allegations, which in turn tainted the entire verdict. While this argument doesn't strike us as particularly strong, we can easily dismiss his sufficiency claims on the merits and need not address his allegations of prejudice. We'll start with the Lake Theater incident.

 Based on his alleged order to Patrick to make Willis Johnson join the projectionists union, one of the racketeering activities Marcello was charged with involved a conspiracy to commit intimidation and arson, felonies under Illinois law (and, of course, racketeering activities under 18 U.S.C. § 1961(1)(A)). At the close of the government's case the district court granted Marcello's dismissal motion on the arson claim, reasoning that the government could not show, as required under Illinois' arson statute, that property had been damaged. Because the owner of the Lake Theater never received a threat, Marcello argues that his actions also did not satisfy the elements of Illinois' intimidation statute. *See* 720 Ill. Comp. Stat. 5/12–6IL-ST-ANN (requiring proof that the accused threatened someone with the intent to cause that person to perform or omit the performance of any act). Marcello believes that the government proved only an incomplete attempt to intimidate, a misdemeanor which does not qualify as a racketeering offense. *See* 18 U.S.C. § 1961(1)(A).

 Marcello misunderstands the law of conspiracy. The indictment alleged that he *conspired* to commit intimidation. Marcello was not charged, as he repeatedly suggests, with misdemeanor attempted intimidation. When a defendant is charged with conspiracy to commit a particular crime, the government need only establish that the defendant and at least one other person intended their future conduct to include all of the elements of the substantive offense. As a result, the government needed only to show that Marcello agreed to exert improper influence on the owner of the Lake Theater in an effort to compel him to act against his will. *See United States v. McNeal*, 77 F.3d 938, 942–43 (7th Cir.1996). A rational juror could have concluded that the government met that burden. The trial evidence made clear that Carlisi and Marcello had a motive to intimidate the

owner of the Lake Theater. After all, Johnson was butting heads with their sons' union. Patrick, whose crew had come under Carlisi's thumb in 1986, testified that he was then summoned to a meeting with Marcello, who explained that Carlisi wanted Patrick to give the owner of the Lake Theater a little trouble and make him "join the union." Patrick in turn assigned the job to Rainone and company, whose failed attempts to torch the theater conjure up images of the Keystone Kops. And although the evidence revealed that Marcello was upset by the decision to bomb the theater, his order set the conspiracy in motion, and he certainly could foresee that Patrick or his cronies might use violent means to make Johnson join the union. *See United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir.1996). As a result, the jury was entitled to find that Marcello agreed to intimidate the owner of the Lake Theater.

■ The plot to murder Daddino was also supported by sufficient evidence. Marcello's main contention here is that the government failed to prove that any of the co-conspirators engaged in an act in furtherance of the plot. **See** 720 Ill. Comp. Stat. 5/8–2(a). This argument goes nowhere. The evidence, again viewed as it must be in the light most favorable to the government, established that Joe Vento asked James LaValley to locate Rainone. Rainone then met with Marcello, who asked him to "pull the lock" at Daddino's house in order to let the hit men in. The evidence also showed that Marcello gave Rainone a walkie-talkie to use when breaking in and later asked Patrick to get his walkie-talkie back. Given this testimony, the jury could have taken its pick of acts in furtherance.

■ Zizzo next argues that the evidence was insufficient to convict him of making and collecting the LaBarbera loan. He contends that the loan was a personal deal between Chiaramonti and LaBarbera. In support, Zizzo stresses he never met LaBarbera, and that unlike the other loans—which were all cash deals—LaBarbera's loan was disbursed via check from an account bearing the name of "A. Chiaro."

Although LaBarbera dealt directly with only Chiaramonti, the evidence established that Zizzo, as third in command, supervised the crew's juice loan operation. It also made clear that he was mixed up in the LaBarbera loan. For example, Chiaramonti originally told LaBarbera to make his interest payments in envelopes marked "LT." The jury could certainly conclude that those initials referred to "Little Tony" Zizzo. But that's not all. Falzone also told LaBarbera that he saw Chiaramonti give the "little guy" LaBarbera's $1,000 payment toward the principal of the juice loan. Finally, and certainly most damning, Chiaramonti explained to LaBarbera that Little Tony had agreed to settle his delinquent interest on the juice loan for $2,000. Based on that evidence, a rational juror could find that Zizzo had made and collected the LaBarbera loan.

■ Chiaramonti next maintains that the jury's verdicts against him on the racketeering, gambling, and tax counts cannot stand. Only his challenges on Counts One and Two warrant discussion. Noting that a 5–year limitations period applies to both § 1962(d) and § 1955, he first argues that his convictions on both counts are infirm because the jury could not have rationally concluded that he was involved in either the RICO conspiracy or the illegal gambling business after 1987. (The indictment, you'll recall, was returned in December 1992.) Rather, Chiaramonti asserts that he was out of both rackets by the early 1980's. Chiaramonti also thinks the jury received bum instructions on the gambling charge.

Viewing the facts in the light most favorable to the government, we see no reason to trump the jury's findings. A rational juror could certainly find that Big Tony was mixed up in the RICO conspiracy throughout its existence. Chiaramonti concedes the evidence linked him to O'Dell and Zizzo but argues he was out of the loop by 1983. However, the LaBarbera loan was not even made until 1988, and the weekly interest payments stretched into 1990. And although Chiaramonti claims the LaBarbera deal was a business loan made with personal funds, we have already detailed Zizzo's role in that transaction. In addition, coconspirator James Palaggi testified that after he was released

from prison in 1988 he saw the "two Tonys" exchange juice loan payments on a regular basis. Palaggi also stated Chiaramonti told him he worked for Carlisi and had to share all of his profits with him—including any money he made on the LaBarbera loan. Although Chiaramonti claims Palaggi's testimony should be disregarded because the jury found he had not agreed to one of the racketeering acts about which Palaggi testified, we leave credibility matters to the jury. *See Best*, 939 F.2d at 431 n. 2 ("Speculation on the jury process is a futile pastime at best.").

Chiaramonti's attack on the jury's verdict on the illegal gambling charge fares no better. He concedes he and O'Dell ran a crew betting location in the early 1980's but argues that nothing links him to the conspiracy after 1983. He also admits that he took horse racing bets for the crew in 1988. He simply asserts that horse racing was not one of the sports covered by the crew's gambling operation. First, the indictment clearly alleged that the crew's illegal gambling business took bets on horse racing. When that little fact is coupled with Chiaramonti's statements to Palaggi that he had to share his profits with Carlisi, who did not allow "outlaw" gambling operations, the jury could rationally conclude that the bets Chiaramonti took on horse races in 1988 were related to the crew's gambling business. Additionally, one of Chiaramonti's employees testified that Frank Bonavolante, the head of the crew's illegal gambling operation, called Chiaramonti on a daily basis from 1987 through 1989. The evidence also showed that Chiaramonti spearheaded a 1989 crackdown on non-Outfit betting offices. And since the jury only needed to conclude that Chiaramonti "aided and abetted" the gambling business, that crackdown alone provided a sufficient basis for Big Tony's conviction. Finally, crew bookies sent losing bettors to Chiaramonti's juice loan operation, which Palaggi testified was still up and running after 1987. Because those loans played a major role in keeping the gambling business in the black, the jury was certainly entitled to conclude that Chiaramonti, through his juice loan operation, aided the crew's illegal gambling business.

We next address Chiaramonti's claim that the jury's verdict on the § 1955 count was the product of improper instructions. Chiaramonti alleges the district court should have specifically instructed the jurors that they needed to unanimously agree on both the identity of the five persons involved in the gambling business as well as their relevant periods of participation. Because Chiaramonti did not object to the instructions, we review his claim only for plain error. *Olano*, 507 U.S. at 734, 113 S.Ct. at 1777–78.

One court has found the lack of a specific unanimity instruction as to the elements of § 1955 to constitute plain error. *See United States v. Gilley*, 836 F.2d 1206 (9th Cir.1988). In *Gilley*, the gambling operation at issue was started by only two people and originally operated out of one defendant's home. At times during the business' 18–month period of operation, however, the enterprise employed more than five people. Because the numbers of participants sometimes dipped below the statutory threshold, the Ninth Circuit held that the district judge erred in failing to instruct the jurors that they needed to specifically agree as to "who did what when." *Id.* at 1212.

Our case is a far cry from *Gilley*. First, even *Gilley* recognized that a specific unanimity instruction is unnecessary when the evidence clearly establishes that more than five people were involved in the gambling business at all times. *Id.* at 1212. That was certainly the case here. Carlisi, Marcello, Zizzo, Chiaramonti, Frank and Joe Bonavolante, O'Dell, and Gervasio conducted the business throughout its existence. In addition, a whole host of others were also involved in the operation for definite and substantial periods. They included Pielet (1980–85), George Friedel (1981–87), Briscoe (1986–89), Marvin Showalter (1983–86), Gill Valerio (1988–90), James DiDomenico (1988–90), Alphonse Tornabene (1989), Anthony Carvatta (1990), Victor Plescia (1989–90), "Joe the Hat" (1982–83), and "Little Frankie" (1983–89). And even were we to consider the lack of the specific instruction an error, the error was certainly not plain. For in order to constitute plain error, the flaw in

question must have resulted in a miscarriage of justice. *See United States v. Wing,* 104 F.3d 986, 989 (7th Cir.1997). That is, the error must have affected the outcome of the case. *Olano,* 507 U.S. at 734, 113 S.Ct. at 1777–78. Here the district judge gave the jurors a general unanimity instruction and twice properly instructed them on the elements of § 1955. When those instructions are coupled with the extensive cast of characters detailed above, Chiaramonti simply cannot show that, had the district court given a specific unanimity instruction, he likely would have been acquitted on the gambling charge.

■ A final sufficiency challenge pops up in Gervasio's appeal. He points out that when an assistant United States attorney tried to get Michael Huber to identify Gervasio as his bookie in front of the grand jury, the following exchange took place:

AUSA: When you went back to [Tommy Briscoe] you asked him if he was betting with someone?

Huber: Yes.

AUSA: What did he tell you?

Huber: He said that he was.

AUSA: Did he give a name at that time?

Huber: Yes, he did.

AUSA: Who was it?

Huber: I think the guy's name was Tom. I just knew him by sort of a synonym.

AUSA: Tom?

Huber: Yes.

AUSA: How about Richie?

Huber: Richie. That sounds right. Richie it is.

AUSA: Is it Richie?

Huber: Richie. That's correct.

Based on that testimony and a number of Huber's inconsistent statements about the details of his gambling history, Gervasio suggests that Huber is a chronic liar whose testimony was incredible as a matter of law. And without that testimony, Gervasio argues, no rational jury could have found him guilty on any of the charges against him.

■ At trial Gervasio impeached Huber with his grand jury testimony and inconsis-

tent statements, and although his identification of Gervasio may have been something less than a prosecutor's dream, we cannot say Huber's testimony was so unreliable that the jury was not allowed to credit it. A witness' testimony is only incredible as a matter of law when it is unbelievable on its face—that is, when it would have been "physically impossible for the witness to observe what he described, or impossible under the laws of nature for those events to have occurred at all." *Alcantar,* 83 F.3d at 189. Gervasio has not shown that either circumstance is at work here.

Because Huber's testimony was not inherently unreliable, there was certainly sufficient evidence to convict Gervasio on all charges. Huber testified that he had bet over $60,000 with Gervasio in an 18–month period. Huber also explained that after he failed to pay off a losing wager, Gervasio warned him on a number of occasions that the matter would soon be out of his hands. Finally, Huber described how Gervasio twice sent him to a parking lot, where he was threatened and assaulted. That evidence— which was corroborated by the testimony of other witnesses such as bookies Pielet and Friedel (who indicated that Gervasio and Bonavolante used the office at his auto parts store to take bets)—sufficiently supports Gervasio's convictions for conspiring to conduct the affairs of the Carlisi Street Crew through a pattern of racketeering or the collection of unlawful debt (Count One), helping conduct the crew's illegal gambling business (Count Two), and collecting an extension of credit through extortionate means (Count Seven).

With the defendants' evidentiary and sufficiency challenges in our rearview mirror, we turn to their attacks on their sentences. As with their conviction-related claims, we will address only their better arguments, and like before, those not discussed have been considered and are dismissed as meritless.

■ First up is an interesting issue raised by three of the remaining defendants. Marcello, Zizzo, and Chiaramonti contend that the district court improperly imposed a 2–level upward departure to their adjusted offense levels on their RICO convictions to

account for their involvement in organized crime. They argue organized crime was an improper ground for departure because it was already considered by the Sentencing Commission in formulating the guidelines.[7] Whether a district court has based a departure on an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration" by the guidelines is a question of law we review *de novo.*

The district court based its departure on our decision in *Rainone,* 32 F.3d 1203. In that case the defendants (a group which included two of our would-be movie theater arsonists—Mario Rainone and Nick Gio) challenged the district court's authority to impose a 2–level upward departure based upon their ties to the Outfit. The defendants argued because they were convicted of racketeering, and one of the purposes of the RICO statute was to keep organized crime out of the hair of legitimate businesses, the departure constituted double counting. *Id.* at 1209. We found the departure kosher, distinguishing between garden-variety RICO and conspiracies involving organizations like the Outfit. We noted the "motivation for and the scope of a statute are often ... different things" and "[h]ad the guideline range for RICO offenses been set with the Chicago Outfit in mind, it would have greatly overpunished the run of the mill criminal activities that are the routine grist of RICO prosecutions." *Id.*

Marcello, Zizzo, and Chiaramonti attempt to slip out from under *Rainone* by stressing that their sentencing calculations started from a different subsection of the guidelines. They note the jumping off point for all RICO sentencing calculations is U.S.S.G. § 2E1.1(a), which sets a defendant's base offense level at the higher of: (1) 19; or (2) the level applicable to the underlying racketeering activity. In *Rainone,* the applicable base was determined to be 19 under § 2E1.1(a)(1). Here, because many of the predicate racketeering acts were extortionate credit transactions carrying base offense levels of 20 under § 2E2.1, the defendants were

sentenced under § 2E1.1(a)(2). The crux of the defendants' argument is that the Sentencing Commission already took organized crime into account when setting the base level for extortionate credit offenses. In support, they cite the background commentary to § 2E2.1, which explains:

> These "loan-sharking" offenses typically involve threats of violence and provide economic support for organized crime. The base offense level for these offenses is higher than the offense level for extortion because loan sharking is in most cases a continuing activity.

They also note although loansharking is a continuing activity, multiple convictions for § 2E2.1 offenses do not group under § 3D1.2(d). As a result, they believe that the organized nature of loansharking is already adequately reflected in the guidelines.

Unfortunately for the defendants, we have recently rejected a similar attempt to distinguish *Rainone.* In *United States v. Damico,* 99 F.3d 1431 (7th Cir.1996), *cert. denied,* ——— U.S. ———, 117 S.Ct. 1086, 137 L.Ed.2d 220 (1997), we affirmed a 2–level upward departure for organized crime, holding:

> [A] defendant's involvement in organized crime is not reflected in the base offense level assigned to him under section 2E1.1. That is so regardless of whether the offense level is established under subsection (a)(1) or (a)(2) of the RICO guideline, for neither the RICO statute *nor the underlying offenses to which it applies are limited in application to defendants engaged in organized crime.*

*Id.* at 1439 (emphasis added). We reached that conclusion even though Damico's racketeering act with the highest base offense level was—as here—an extortionate credit transaction. *See id.* at 1436. The simple fact of the matter is that although the commentary to § 2E2.1 mentions that loansharking *typically* provides cash for organized crime, a defendant need not belong to a crime syndicate to be sentenced pursuant to § 2E2.1. That obviously holds true for the rest of the guidelines covering the crew's

---

**7.** To avoid any *ex post facto* concerns, the defendants were sentenced under the 1989 version of the sentencing guidelines.

racketeering activities as well. *See* § 2E3.1 (conducting illegal gambling business); § 2A2.1 (conspiracy to commit murder); § 2X1.1 (conspiracy); and § 2B3.2 (extortion). As a result, we hold that membership in an extensive and ruthless organization like the Chicago Outfit is a proper ground for departure even when the defendant's predicate racketeering activity includes extortionate credit transactions.

■ The defendants' solo sentencing challenges meet with no greater success. For example, Marcello challenges the district court's calculation of his offense level for the conspiracy to intimidate the owner of the Lake Theater. He argues that the district judge should not have assigned him a base offense level of 18 for extortion under § 2B3.2 but rather a mere level 12 for making a threatening communication under § 2A6.1.[8]

In order to pin down Marcello's offense level for the conspiracy to intimidate Willis Johnson, a felony under Illinois law, Judge Plunkett had to determine the "most analogous federal offense," U.S.S.G. § 2E1.1(2), comment. (n.2), and select the "most applicable" sentencing guideline. § 1B1.2(a). Here the district court properly settled on § 2B3.2. While the defendant's choice, § 2A6.1, covers a wide array of "Threatening Communications," § 2B3.2 specifically "applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property[.]" U.S.S.G. § 2B3.2, comment. (n.2); *see also United States v. Johnson*, 965 F.2d 460, 468 (7th Cir.1992). Section 2B3.2, not § 2A6.1, also is meant to cover ambiguous threats, such as "pay up or else." *Id.* In this case, there can be little doubt that property damage (and likely personal injury) was contemplated when the conspirators threw gasoline, a Molotov cocktail, and two grenades on the roof of the Lake Theater. The intended threat to Johnson was clear: "join the union" or have your theaters blown to smithereens.

Marcello also argues the district court improperly grouped the racketeering acts under § 3D1.2. Marcello believes that rather than the nine victim-based offense groups found by the district court, only three offense groups were proper: (1) one for making extortionate extensions of credit; (2) one for collecting extensions of credit through extortionate means; and (3) one for financing Patrick's operation. Although Marcello's argument is of dubious merit, *see Damico*, 99 F.3d at 1436 (convictions for extortionate extraction of street tax grouped by victim), we need not address the issue. The nine groups found by the district court led to an increase of 5 levels under § 3D1.4. Marcello's interpretation of the grouping rules would lead to the same result. He would receive one unit for each of the three groups he identifies, a fourth for the Lake Theater incident, a fifth for the Daddino murder plot, and another one-half unit for conducting the illegal gambling business. Those units, like the district court's totals, would translate to a 5–level increase under § 3D1.4.

Little Tony next raises two arguments regarding his sentence. First, he complains because nothing tied him to the collection of debts owed by Frank Perri, William Stone, Michael Huber, and Anthony Pape, those collections should not have been counted against him at sentencing. Second, Zizzo claims that he should not have been assigned a 3-point increase in his offense level for his role as a manager or supervisor under § 3B1.1(b). Zizzo concedes that he qualified as supervisor but contends that fewer than five people were involved in a couple of the predicate acts underlying the conspiracy.

■ • Neither argument is a winner. The jury found Zizzo agreed that the Carlisi crew would commit multiple acts of collecting and conspiring to collect gambling and juice loan debts through extortionate means. The jury then determined that the crew had used extortionate means to collect a host of debts, including ones owed by Perri, Stone, Huber, and Pape. In holding Zizzo responsible for these offenses for sentencing purposes, the district court reasonably found a preponderance of the evidence established that Zizzo

---

8. Because this conspiracy proved unsuccessful, the district court reduced Marcello's offense level for this act by 3 points under § 2X1.1(b)(2).

served as the supervisor for all of the crew's juice loan and gambling activities. Because Zizzo, as the crew's third in command and street-level supervisor, could reasonably foresee the collections challenged here, all four of which were handled pursuant to the crew's standard operating procedures, he was properly left on the hook for them at sentencing. *See Williams*, 81 F.3d at 1441.

■ Zizzo's attempt to knock out the 3–level boost he received under § 3B1.1(b) also comes up dry. Zizzo's focus on whether fewer than five individuals took part in two of the collections underlying the RICO conspiracy is misplaced. *United States v. Morgano*, 39 F.3d 1358, 1379 (7th Cir.1994).[9] Rather than narrowly considering each predicate offense, we tally up the number of criminally responsible participants by looking at the overall conspiracy. *Damico*, 99 F.3d at 1437–38; *Morgano*, 39 F.3d at 1379 ("Section 3B1.1(b) applies if the 'criminal activity involved' five or more people, a phrase broad enough to include the entire racketeering conspiracy rather than the particular predicate act alone."). In this case the RICO conspiracy certainly involved at least five people. The indictment itself named nearly twice that many. *See United States v. Zarnes*, 33 F.3d 1454, 1474 (7th Cir.1994) (conspiracy "unquestionably" involved more than five persons where the indictment listed ten defendants).

■ We next address Gervasio's claim that he was entitled to a 2–point decrease in his offense level for his minor role in the crew's activities pursuant to § 3B1.2(b). In support, he argues that he was merely a penny-ante phone man. The district court did not buy his argument, and we are not left with the definite and firm conviction that a mistake has been made. The testimony showed that Gervasio—as a full-fledged bookmaking agent—took in over $60,000 in bets from a single customer (Huber) in an 18–month period. In addition, after Huber welched on a $2,500 wager, Gervasio cut off his betting privileges and repeatedly met with him to discuss his delinquent debt. It's hard to imagine that the crew would allow a small potatoes phone man (as Gervasio claims to have been) to make discretionary calls on who could bet with the crew's bookies. Finally, Gervasio twice sent Huber to a parking lot where Outfit thugs were waiting to rough him up. That evidence made clear that Gervasio was not "substantially less culpable than the average participant" in the offenses for which he was convicted. U.S.S.G. § 3B1.2, comment. (backg'd.); *see also United States v. Kerr*, 13 F.3d 203, 206 (7th Cir.1993).

■ One sentencing issue remains. O'Dell maintains the district court clearly erred by bumping up his offense level 2 points for obstruction of justice under § 3C1.1. In order to apply § 3C1.1, the district court must find that the defendant willfully obstructed or attempted to obstruct the administration of justice and that the obstruction was material. *United States v. Mitchell*, 64 F.3d 1105, 1107–08 (7th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996). In this case, Judge Plunkett found that O'Dell triggered the enhancement in two ways. First, O'Dell failed to fully comply with a grand jury subpoena for his financial records. It seems in response to the subpoena O'Dell's accountant gave him all of his financial records, including copies of IRS 1099's which had been prepared for—but never filed by—O'Dell. Rather than turning over the 1099's, O'Dell insisted that he never received the forms and submitted only some canceled checks and receipts. Second, the district court found that O'Dell perjured himself while testifying in his own defense.

The district court did not err in applying § 3C1.1. Based on the evidence that came to light at trial, the judge reasonably found that O'Dell successfully avoided tax evasion charges by only turning over a portion of the records underlying the disappearing 1099's. That alone justified a finding of obstruction of justice. But that was merely the tip of the iceberg. The judge specifically found that

---

**9.** Ironically, the case that dooms Zizzo's argument involved his father. *See Morgano*, 39 F.3d at 1363.

O'Dell perjured himself at trial. Even when viewed in the light most favorable to O'Dell, we agree that much of his testimony was, as Judge Plunkett put it, preposterous. One comparatively small example will suffice. In mounting his defense against the charges that he willfully failed to file tax returns, O'Dell testified that he didn't file because he didn't have enough money to pay his taxes and was afraid tax liens would ruin his credit. We can't say the district judge was off base in finding that this testimony was somewhat "less than truthful," *United States v. Hofer*, 995 F.2d 746, 750 (7th Cir.1993). The trial evidence showed at the time he was too "broke" to pay Uncle Sam, O'Dell purchased a $450,000 home, pumped another $100,000 into improvements on it, had his business buy a $54,000 Cadillac limo for his personal use, shelled out $68,000 for a 28–foot boat, sought to buy a 32–footer for $102,000, and purchased a "dockominium" (a fancy boat slip) for the bargain-basement price of $42,000. Various financial records and unfiled tax forms prepared during that same period also listed substantial amounts of income, which O'Dell claimed to be unable to identify. We should all be so down on our luck.

■ Finally, we address a motion for a new trial. Marcello argues he was entitled to a new trial based upon newly discovered evidence that the prosecutors had suborned perjury. Marcello alleges that the prosecutors allowed James LaValley to testify that he had committed every crime in the book "short of murder" when in "reality," they knew of—and illegally withheld—evidence linking LaValley to a killing. This issue was originally raised by Carlisi some 6 months after Marcello had been sentenced and filed this appeal. Carlisi's motion, which was joined by Marcello, was promptly denied by the district court. Carlisi filed a notice of appeal from the denial. Marcello, on the other hand, did not bother to do so. As a result, we lack jurisdiction to hear this claim. *United States v. Douglas,* 874 F.2d 1145, 1162 (7th Cir.1989); *see also United States v. Harvey,* 959 F.2d 1371 (7th Cir.1992).

For all these reasons, we remand the case of Sam Carlisi to district court with instructions to vacate his conviction and dismiss the indictment as to him. As noted, however, the fine, costs, assessments, and forfeitures paid by Mr. Carlisi need not be refunded. The judgments as to Zizzo, Marcello, Gervasio, Chiaramonti, and O'Dell are

AFFIRMED.