UNITED STATES of America,
Plaintiff–Appellee,

v.

Mario J. RAINONE, Gus ALEX, and
Nicholas GIO, Defendants–
Appellants.

Nos. 92–3154, 93–1585 and 93–1586.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1994.

Decided Aug. 23, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 7, 1994
in No. 93–1585.*

* Rovner, Circuit Judge, took no part in the consideration of the suggestion for rehearing en banc.

Chris C. Gair, Asst. U.S. Atty., Debra Riggs Bonamici (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

JoAnne F. Wolfson, Chicago, IL, for Mario J. Rainone.

Thomas P. Sullivan, Jenner & Block (argued), Carl M. Walsh, Chicago, IL, for Gus Alex.

Marvin Bloom, Chicago, IL (argued), for Nicholas Gio.

Before POSNER, Chief Judge, MANION, Circuit Judge, and REYNOLDS, District Judge.**

POSNER, Chief Judge.

Those who in these whirling times still genuflect to tradition will be gratified to learn that the "Chicago Outfit," once led by Al Capone himself (see ITT Research Institute & Chicago Crime Commission, A *Study of Organized Crime in Illinois* 36–43 (1971)), was still alive and kicking in the otherwise much changed Chicago of the 1980s. *Organized Crime in Chicago: Hearing before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs*, 98th Cong., 1st Sess. 157–96 (1983) (statement of William F. Roemer, Jr., of the Chicago Crime Commission, linking the defendants in this case to Capone, Nitti, Accardo, and other Outfit bosses in an unbroken line of descent). One of its rackets was the protection racket, in which owners of restaurants, automobile dealerships, and other small firms were commanded to make substantial cash payments under threat, if they refused, of the destruction of their property and death and injury to themselves and their families. The racket was conducted at the operating level by the Outfit's "street crews," such as the "Patrick Street Crew," headed by the well-known Outfit member Leonard Patrick. *Organized Crime in Chicago, supra,* at 177. The indictment in this case, handed down in 1991, charged Patrick and two members of his crew, Nicholas Gio and Mario Rainone (the latter being Patrick's second in command), along with Gus Alex, the higher-up in the Outfit (*id.* at 170–71) to whom Patrick reported, with various offenses. The principal one was conspiring to conduct the business of the Patrick Street Crew between 1983 and 1989 through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), a provision of the RICO (Racketeer Influenced and Corrupt Organizations) statute. The indictment listed as predicate offenses of RICO numerous acts of arson, intimidation, and extortion. Patrick turned state's evidence and testified against the other defendants. In return he was permitted to plead guilty to offenses predating the federal sentencing guidelines and was sentenced to only six years in prison, later increased to seven when he violated the plea agreement by perjuring himself in another case (more on this later). Rainone pleaded guilty without engaging in plea bargaining, while Alex and Gio were convicted by a jury after a trial in 1992. Alex, Gio, and Rainone received prison sentences of 188, 137, and 210 months, respectively. Alex was also fined $250,000, and both he and Rainone were subjected to heavy forfeitures. Each of these three defendants has appealed, though Rainone's appeal is limited to the sentence.

The details of the crimes are not important. Typical is an incident in which Rainone, on the orders of Patrick and with the approval of Alex, went to a restaurant owned by a man named Moss and demanded $2,000 a month. He told Moss that if he didn't pay "they would find [Moss] in his walk-in freezer." To underscore the threat Rainone punched Moss in the jaw and said, "I know where your family lives. I know how to get your kids." So Moss paid.

The evidence against Alex and Gio was overwhelming. The government's principal witness was Patrick himself, admittedly an unreliable person, as we shall see—but there was also a highly incriminating tape, testimony by another member of the street crew who had turned state's evidence named La-Valley, and testimony by two friends of Patrick and Alex who had carried messages between them because the two mobsters were reluctant to use the phone. Alex and

---

** Hon. John W. Reynolds of the Eastern District of    Wisconsin.

Gio complain that they were unduly limited in their ability to cross-examine Patrick because the district judge refused to allow their lawyers to use in that cross-examination certain documents that they had obtained by subpoena from Patrick's former lawyer, David Mejia. Mejia had represented Patrick up through his guilty plea but afterward they had had a falling out and Patrick had accused Mejia of relaying an offer from Alex to pay Patrick for silence. The subpoena, which Alex's lawyer served on Mejia shortly before the trial, demanded all documents in Mejia's possession relating to Patrick. Mejia turned over a number of documents, including notes that Patrick had written to Mejia while Mejia was representing him. When Alex's lawyer tried to use these notes to impeach Patrick's testimony at trial, the government objected that the notes were protected from disclosure by the attorney-client privilege. The judge conducted an evidentiary hearing, upheld the claim of privilege, and refused to permit the notes to be used in the cross-examination of Patrick. The *government* objected? But it was Patrick's attorney-client privilege, not the government's, and the privilege is of course waivable. The appellants make nothing of this point, however, perhaps because when Patrick testified at the evidentiary hearing and was asked whether he had authorized the turning over of his notes to Alex's counsel he said he had not, thus indicating that he had not waived the privilege.

■ The judge did not act unreasonably ("abuse his discretion," in the standard jargon) in determining that the notes were indeed protected by the privilege. (On the scope of the privilege, see generally *Fisher v. United States,* 425 U.S. 391, 403–05, 96 S.Ct. 1569, 1577–78, 48 L.Ed.2d 39 (1976), and *United States v. White,* 950 F.2d 426, 430 (7th Cir.1991).) Evidence that the district judge was entitled to credit and did credit established that the notes had been prepared by Patrick at the direction and for the use of his then lawyer, Mejia, that they were in Patrick's case file in Mejia's office when subpoenaed, and that they give Patrick's versions of the acts of which the indictment accused him.

■ Evidentiary privileges are not absolute, however. Even privileges recognized when the Constitution was written can be trumped by constitutional rights, such as the right of confrontation conferred by the Sixth Amendment and interpreted to include the right of cross-examination. *Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 482, 102 L.Ed.2d 513 (1988) (per curiam); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); John W. Strong, *McCormick on Evidence* § 74.2, at pp. 279–81 (4th ed. 1992). Even the attorney-client privilege, therefore, hallowed as it is, yet not found in the Constitution, might have to yield in a particular case if the right of confrontation, whether in its aspect as the right of cross-examination or in some other aspect, would be violated by enforcing the privilege. So at least dicta in two cases intimate. *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 501 (7th Cir.1982); *Jenkins v. Wainwright,* 763 F.2d 1390, 1392–93 (11th Cir. 1985). But we have difficulty imagining an actual case in which the right to counsel and the attorney-client privilege would clash; they are fundamentally complementary rather than antagonistic. If a defendant knows that his communications with his lawyers can be subpoenaed by his codefendants should he have a falling out with them, and then waved in front of a jury, and then used, having thus lost their privileged status, to convict him of additional crimes, he will be inhibited in communicating with his lawyer, and it will be more difficult for him to prepare an effective defense; the practical value of his Sixth Amendment right to the effective assistance of counsel will therefore be less. At the same time, the government's ability to pry one defendant loose from the others and induce him to turn state's evidence will be impaired as well, to the detriment of the successful prosecution of complex and sophisticated conspiracies, as in the present case.

As this case also illustrates, the incremental contribution of communications within the scope of the attorney-client privilege to effective cross-examination is likely to be small. The lawyers for Alex and Gio spent three days cross-examining Patrick and brought out among other things that he had committed perjury on a number of occasions, had

bribed politicians and police officers, had engaged in extortion and loansharking, and had committed six murders. These things were easy to bring out because Patrick's direct testimony had recounted the activities of his street crew—activities he had directed. He admitted, what was of course obvious, that he had an enormous incentive to play ball with the government—that otherwise he would die in prison—and even admitted that he would lie on the stand in this very case in order to stay out of prison. The jury thus was made well aware that he was a thoroughly reprehensible and unreliable person. The notes he had written to Mejia would have added too little to the picture to warrant abrogating the attorney-client privilege; so at least the district judge was entitled to conclude. One of the notes, for example, states that an FBI agent told Patrick that if he didn't cooperate the government would imprison him with former accomplices who would kill him for having ratted on them. Alex argues that he could have used the note to show that Patrick was coerced into testifying. But since Alex was at such pains to convince the jury that Patrick was a liar, on what ground could he ask the jury to believe, about this improbable threat alone, that Patrick had been telling the truth? Other notes gave discrepant accounts of some of the predicate acts. If asked about them Patrick would have said either that he was lying then and was telling the truth now (he gave many answers of that character) or that he had been confused or unclear; nothing new there. There is no argument that any of the notes were planning documents for perjury or other future crimes, in which event the shield of the attorney-client privilege would, of course, be withdrawn.

The right of cross-examination, whether as a matter of constitutional law or the law of evidence, is not absolute. *Olden v. Kentucky,* 488 U.S. 227, 231–32, 109 S.Ct. 480, 482–83, 102 L.Ed.2d 513 (1988); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *United States ex rel. Blackwell v. Franzen, supra,* 688 F.2d at 500–01. It is limited, at the discretion of the trial judge, in time and scope, and in the nature and amount of evidence that may be used to nail the witness.

A trial judge does not violate the Constitution when he limits the scope of cross-examination for a good reason, and here as in the usual case desire to protect the attorney-client privilege was a good reason.

The appeals raise several other issues.

1. Shortly after the trial Patrick perjured himself while testifying against the current boss of the Chicago Outfit, Carlisi, in another case. Under cross-examination about the six murders, which in that trial as in this one were flagged to the jury in an effort to discredit Patrick's testimony, Patrick falsely claimed that one of the murders had been committed in self-defense and so hadn't been murder at all. Alex and Gio describe this perjury as newly discovered evidence of Patrick's utter unreliability, warranting a new trial. Newly discovered it may have been, evidence it may have been, but evidence important enough to warrant a new trial it was not. It is conceded all 'round that Patrick is a liar. Most criminals turned government witnesses are. The motive for this particular lie is obvious and has little if any connection with Patrick's credibility with respect to the issues in this case: he was afraid of being charged with murder. He has in fact since been charged by the State of Illinois with three murders. Newly discovered evidence is not a good ground for a new trial unless the evidence if believed would be likely to change the outcome of the old trial. *United States v. DePriest,* 6 F.3d 1201, 1216–17 (7th Cir.1993); *United States v. Taglia,* 922 F.2d 413, 415–16 (7th Cir.1991). Believing that Patrick perjured himself one more time, in an understandable though not justifiable effort to avoid being prosecuted for murder, would not lead a reasonable person to exonerate these defendants.

2. Alex was 75 years old when the case was tried in 1992, and was showing early signs of senile dementia of the Alzheimer's type. Expert reports were submitted to the district judge, but only the government's addressed the statutory standard for competency (18 U.S.C. § 4241(d)), finding that Alex met it; and even one of the reports submitted on behalf of Alex described his "neuro-

logical and cognitive performance" as falling "within normal limits." On the basis of the reports the district judge found, not clearly erroneously, that there was no "reasonable cause" to believe that Alex was incompetent to stand trial. 789 F.Supp. 953 (N.D.Ill. 1992). The judge therefore properly declined to hold a hearing on the issue. 18 U.S.C. § 4241(a). Alex argues that even if that decision was correct (which he questions, but on grounds too tenuous to require discussion), his lawyer should have been permitted at trial to ask the two go-betweens their impressions of Alex's alertness and gait during the period of the conspiracy, to support the defense that Alex lacked the mental capacity, limited as it is, required to join a conspiracy. The judge was entitled to bar the defense and thus exclude this evidence. A defendant is not entitled to have the jury consider a defense for which there is no probative evidence, *United States v. Patrick,* 542 F.2d 381, 386 (7th Cir.1976) (our same Patrick); *United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985); *United States v. Tanner,* 941 F.2d 574, 587 (7th Cir.1991), and that was the case with respect to Alex's defense that he was incapable of forming the intent necessary to be guilty of participating in a RICO conspiracy.

■ It is true that such a defense is not the same thing as a defense of insanity or mental incompetence. Indeed it is not really a defense at all, but an effort to derail the government's attempt to prove whatever mental element the criminal statute that it is enforcing requires. See generally *Haas v. Abrahamson,* 910 F.2d 384 (7th Cir.1990). But in this case the issues of intent and competence merge: Alex wanted the jury to infer, with the aid of the go-betweens' excluded testimony, his inability to form the required intent from the evidence of early Alzheimer's that he had presented at the competency hearing. This was an exercise in futility. He was trying to make time run backwards. For senile dementia is a progressive disease. If Alex was competent to stand trial in 1992, he must have been competent to conspire with Patrick and the others years earlier, whatever a couple of his friends may have thought. We add that a tape recording of a conversation that he had with Patrick during the period of the conspiracy reveals no mental incapacity.

The other issues relating to guilt are either resolved by decisions of this court that we are not disposed to reexamine or have no possible merit, and we turn therefore to the sentencing issues.

■ 3. Was a two-level upward departure from the normal guidelines range for persons convicted of participating in a RICO conspiracy warranted because of threats made by the defendants against the victims of their extortion and the members of the victims' families? A subsequent amendment to the guidelines authorizes a two-level adjustment for threats of bodily injury and death, U.S.S.G. § 2B3.2(b)(1), and a subsequent amendment is an appropriate guide for a departure in sentencing a defendant under an earlier guideline. *United States v. Boula,* 997 F.2d 263, 267 (7th Cir.1993); *United States v. Harotunian,* 920 F.2d 1040, 1046 (1st Cir.1990). The addition of the adjustment shows that the previous guideline omitted a factor relevant to sentencing under the scheme of the guidelines, and it is precisely (and only) such an omission that is a proper basis for a departure. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0; *United States v. Schweihs,* 971 F.2d 1302, 1316–17 (7th Cir.1992). It can make no difference that the threats against the members of the families of the extortion victims were not communicated directly to those family members. The guidelines do imply that a threat of which the threatened person remains ignorant is not a basis for an upward adjustment or upward departure, see U.S.S.G. § 2B3.1, Application Note 6; § 2B3.2, Application Note 2; *United States v. Wint,* 974 F.2d 961 (8th Cir.1992), and there is no indication that the victims of the defendants' extortions told their families about the threats. But it does not matter. The extortion victims themselves, such as Moss, were also threatened with physical injury; the mention of their families merely magnified the threats.

■ 4. The judge departed upward another two levels because the defendants were engaged in "organized crime." Concern with the penetration of legitimate businesses by criminal syndicates, such as the Chicago Out-

fit, was a principal motivation for the RICO statute, *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), and "racketeering" is a frequent synonym for the characteristic activities of such syndicates. These observations fuel the defendants' contention that the base offense level of 19 that the Sentencing Commission assigned to RICO convictions reflects the greater gravity of criminal activities engaged in by criminal syndicates, so that a departure upward when the defendant was part of such a syndicate would be double counting. We do not agree. The motivation for and the scope of a statute are often and here different things. The term "racketeering activity" in the RICO statute is a defined term, and the definition is remote from the ordinary-language meaning; all it means is committing one of a number of specified criminal acts. 18 U.S.C. § 1961(1). For conviction, it is true, some minimum structure is required (in addition to a "pattern" of racketeering activity, 18 U.S.C. § 1962)—an "enterprise" is required, 18 U.S.C. § 1961(4). But the "enterprise" need be nothing more than a small, informal gang, as in *Burdett v. Miller,* 957 F.2d 1375, 1379 (7th Cir.1992), and *United States v. Masters,* 924 F.2d 1362, 1367 (7th Cir.1991), having minimum structure and continuity; or a lawful enterprise turned to a corrupt end by a corrupt manager, as in *United States v. Robinson,* 8 F.3d 398, 406–07 (7th Cir.1993), and many other cases. We deal here with a criminal syndicate of extensive scope and extraordinary durability—one of the oldest and most notorious criminal enterprises in the United States. Had the guideline range for RICO offenses been set with the Chicago Outfit in mind, it would have greatly overpunished the run of the mill criminal activities that are the routine grist of RICO prosecutions.

We grant that the term "organized crime" is nebulous, and that there are dangers in too casually attaching the appellation to gangs that happen to seem particularly ominous. But we need not explore the outer bounds of the permissible "organized crime" departure in this case. The Chicago Outfit is the clearest possible example of a gang operating on such a scale, with such success, over such a long period of time that the danger which it poses to society is not adequately reflected in the guideline range. It is not your average criminal RICO violator.

5. Gio committed arson in a caper with LaValley, for which he was convicted. *United States v. Gio,* 7 F.3d 1279 (7th Cir. 1993). If the arson was conduct "related" to the RICO conspiracy, the judge would have had to make Gio's sentence for the conspiracy run concurrently with his 63–month sentence for that arson, rather than consecutively, pursuant to a provision, since deleted, in the version of U.S.S.G. § 5G1.3 under which Gio was sentenced. Although Gio obtained Patrick's permission to commit the arson—obtained it through Rainone, who even supplied Gio with a hand grenade with which to commit it—this did not make it an Outfit job. It is commonplace in legal enterprises, and so far as the record discloses in the Chicago Outfit as well, for a subordinate to ask his superior's permission to engage in outside activities. Otherwise a vacation would be a form of work if the employee needed permission from his employer to take it. Gio did not share the gains from the job with Alex, Patrick, or any other Outfit figure—even, so far as the record shows, Rainone—other than, of course, his coventurer, LaValley.

AFFIRMED.