

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-2003

# USA v. Mussayev

Precedential or Non-Precedential: Precedential

Docket No. 02-1924P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Mussayev" (2003). *2003 Decisions.* Paper 306.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/306

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 6, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1924

UNITED STATES OF AMERICA

v.

ALEX MUSSAYEK,
a/k/a TSION MUSSAYEK,
a/k/a ALEXANDER MUSSAYEL,
a/k/a ALEXANDER MUSSYEV

Tsion "Alex" Mussayev,
                                    Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 00-cr-00180)
District Judge: Honorable Anne E. Thompson

Argued February 3, 2003

Before: SLOVITER, RENDELL and STAPLETON,
*Circuit Judges.*

(Filed August 6, 2003)

Chester M. Keller, Esq. [ARGUED]
Andrea D. Bergman, Esq.
Office of Federal Public Defender
972 Broad Street
Newark, NJ 07102
*Counsel for Appellant*

George S. Leone, Esq.
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Thomas Ott, Esq. [ARGUED]
United States Department
 of Justice
Organized Crime & Racketeering
 Section
1301 New York Avenue, N.W.,
 Room 715
Washington, DC 20005
*Counsel for Appellee*

## OPINION OF THE COURT

RENDELL, *Circuit Judge.*

Alex Mussayek[1] appeals from the final judgment of conviction and sentence entered against him by the District Court on March 27, 2002, after he was found guilty by a jury of one count each of conspiracy to commit extortion and interstate travel in aid of racketeering. We will affirm.

## FACTS

Alex Mussayek emigrated from Israel to the United States in 1979. He settled in Brooklyn with his family, and established himself as owner of a small flower and candy business. Over several years, Mussayek was apparently victimized by two individuals, Ike Fogel and Phillip Ben Jacob, in separate scams. Mussayek claims to have been first defrauded by Fogel in a transaction involving $400,000 worth of "diamonds," which apparently later turned out to be nothing but cubic zirconia. Attempting to recoup his losses, Mussayek then apparently committed $140,000 to a

---

1. In the caption of this case and in the record, Appellant's surname is spelled, variously, as "Mussayek," Mussayel," "Mussyev," and "Mussayev." Throughout our opinion we will use "Mussayek," the construction adopted in both parties' briefs.

partnership with Ben Jacob, which ultimately dissolved with Ben Jacob refusing to return any of Mussayek's investment.

Mussayek's brief depicts a persevering immigrant trying to live out "the classic American dream," struggling to make a living and support his family while being swindled by two supposed "friends" of over $500,000. Not surprisingly, the government paints a very different picture of Mussayek, as a deal maker involved in a variety of illicit ventures who sought the help of undercover agents — who he thought were "Italian Mafioso" — in connection with several of them. Most relevant to this appeal, Mussayek enlisted two agents to assist with a plan carried out with another business associate, Joseph Aharanoff, to extort money from Ben Jacob and Fogel in furtherance of Mussayek's "deep commitment," as Mussayek has termed it, to recover his money.

Following the undercover investigation, Mussayek and Aharanoff were indicted on charges of conspiracy to commit extortion against Ben Jacob and Fogel.[2] Pursuant to an agreement with the government, Aharanoff pled guilty and testified against Mussayek. At trial, the jury heard extensive evidence relating to the conspiracy, including numerous tape recorded conversations between Mussayek and the agents, as well as the testimony of Aharonoff, Mussayek himself, and both of the undercover agents, Zyckowski and Calvarese. Aharanoff and the two agents testified consistently that Mussayek was outraged and preoccupied with the supposed betrayal by Fogel and Ben Jacob and was determined that the agents should, if necessary, break their legs or kill them. In addition, they testified that Mussayek wanted to double his money or obtain $1 million from Fogel, and was prepared to kidnap his daughter. Mussayek warned the agents that Ben Jacob had guns with silencers and agreed to pay them twenty-five percent of their recovery, giving them a $5,000 down

---

2. Mussayek and Aharanoff were also indicted for money laundering activity allegedly relating to transactions involving proceeds from illegal drug dealings. As Mussayek was acquitted of those charges, however, we are concerned here only with the charges relating to extortion.

payment. The jury further heard that Aharanoff had once traveled to Israel, where he was later joined by Mussayek, in an effort to locate Fogel, and that subsequently Aharanoff and Agent Calvarese were on their way to Israel to "complete Mussayek's mission" when they were stopped by the Federal Bureau of Investigation at the John F. Kennedy International Airport in New York.

Ultimately, the jury found Mussayek guilty of conspiracy to commit extortion and interstate travel in aid of racketeering. On appeal Mussayek levels eight challenges to the District Court's handling of his trial and sentencing. We will focus on three of his claims, all related to his sentencing, as the remainder are fairly straightforward and will be addressed briefly in the margin.[3]

The Pre-Sentence Report recommended, and the government argued, that Mussayek's base offense level should be enhanced two levels under U.S.S.G. § 2B3.2(b)(1), because it "involved an express or implied threat of death, bodily injury, or kidnapping." Mussayek objected, stating, "This enhancement presumes that the victim in fact received a threat . . . . [N]o reasonable threats were ever communicated to any purported 'victim' and thus the enhancement cannot apply." Addendum to Pre-Sentence Report, p. 18, ¶ 2.

Mussayek similarly objected to another proposed enhancement, under U.S.S.G. § 2B3.2(b)(3)(B), for "preparation to carry out a threat of . . . serious bodily

3. Contrary to Mussayek's contentions, we conclude that: (1) the District Court adequately instructed the jury on two occasions that the indictment was not evidence, and it did not abuse its discretion by refusing to give a third such instruction; (2) there was no abuse by the District Court in curbing the questioning of a hostile witness, Aharonoff, when the interrogation became argumentative and repetitive; (3) there was no plain error in the District Court's admission of evidence of Mussayek's involvement with a controlled substance, "khat;" (4) the application of a sentencing enhancement under U.S.S.G. § 3B1.1(c) for Mussayek's supervisory role was not clearly erroneous; and (5) we lack jurisdiction to review the District Court's exercise of discretion in connection with its refusal to depart downward based on family circumstances, as it clearly considered this argument but was not persuaded by it.

injury." Mussayek contended that he told the agents to talk to Fogel and Ben Jacob "nicely," stating at one point, "Talk to him nicely everything, I don't wanna kill the guy, I don't wanna make him damage something." Addendum, ¶ 3. Mussayek's counsel stated:

> While Mr. Mussayek provided information about both Ike Fogel and Phillip Ben Jacob, it was in order to assist the agent in locating them and in identifying assets. Mr. Mussayek gave information about Ike Fogel and Phillip Ben Jacob in an effort to get his money legally. He told Agent Calvarese where Mr. Ben Jacobs' office was located and provided a phone number.

Addendum, ¶ 3. Counsel also argued that Aharanoff's travel to Israel was for personal reasons, not to obtain information about Fogel for the purpose of later extorting him.

In addition to arguing against the government's proposed enhancements, Mussayek urged the District Court to grant him a downward departure for victim provocation, under U.S.S.G. § 5K2.10, based on the "[un]clean hands" of his debtors, Fogel and Ben Jacob, i.e., their unethical and, at least in the case of Fogel, perhaps illegal, taking of money from him.

The District Court ruled against Mussayek on all three sentencing issues. The court held first that the "threat" enhancement applied, reasoning that if the conviction was for conspiracy, the threat need not be communicated. It noted: "If [the threat] was communicated to the person who was supposed to carry it out, and it was in this case and the jury so finds, then it seems to me that the argument cannot prevail." The District Court also applied the "preparation" enhancement, stating:

> Whether you characterize the trip to Israel as Aharonoff was going to make the trip anyway or not, the specific locating of the victim in Israel was clearly directed by the defendant. That in and of itself would seem to me clearly to be preparation to carry out the threat.

Finally, the court had little difficulty in refusing to apply a departure downward for victim conduct under § 5K2.10.

Under its view, the guideline envisioned a situation in which the victim's conduct was more "directly provocative," and "contributed to the danger presented," whereas here there was only a "debt owed" such that the "redress . . . appropriate would be a lawsuit, a resort to a report to the police."

Mussayek now challenges the District Court's disposition of all three of these sentencing issues. We can find no reversible error, and will address each argument in turn.[4]

## I. Enhancement for Threat of Death, Bodily Injury or Kidnapping under U.S.S.G. § 2B3.2(b)(1)

Mussayek first raises the novel question as to whether, in order for the base offense level for conspiracy to commit extortion to be enhanced because it "involved an express or implied threat of death, bodily injury, or kidnapping," U.S.S.G. § 2B3.2(b)(1), the threat must have been communicated to the victim. As we noted above, the District Court relied on the fact that the underlying conviction was for conspiracy, and the fact that the threat was communicated to persons who were to carry it out, in finding the enhancement to apply. Our review of the District Court's legal interpretation of the Sentencing Guidelines is plenary. *See, e.g., United States v. Bamfield*, 328 F.3d 115, 118 (3d Cir. 2003). We will affirm the District Court's application of the enhancement.

The extortion guideline at issue provides for a base offense level of 18, with the following specific offense characteristic: "If the offense involved an express or implied threat of death, bodily injury, or kidnapping, increase by 2 levels." U.S.S.G. § 2B3.2(b)(1). That subsection is followed by a listing of four other specific offense characteristics that increase the base offense level, including "the amount demanded or the loss to the victim;" the use, brandishing, possession, or discharge of a firearm or other dangerous weapon; bodily injury sustained by the victim; and abduction or physical restraint of any person. U.S.S.G. §§ 2B3.2(b)(2)-(b)(5). Also included is the enhancement for

---

4. The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

the preparation to carry out threats, *see* U.S.S.G. § 2B3.2(b)(3)(B)(ii), which is also at issue here and is discussed further below.

Mussayek argues that the purpose of the guideline is to punish more severely those who place their victims in fear of, for instance, death or serious bodily injury, and, accordingly, urges that an enhancement for the content of a threat makes little sense if the threat was not communicated. In short, he maintains that if the enhancement is meant to redress, and punish for, particular harms to victims caused by threatening statements, then the enhancement should not apply where, as here, the victims did not know about, and thus could not have been harmed by, the statements in question.

Contrary to Mussayek's contentions, however, the guideline appears to be but one example of the Sentencing Commission's manifest desire to address dangers presented by the defendant wholly apart from the actual damage or harm caused. The guidelines contain numerous situations in which the Sentencing Commission looks to, and escalates punishment for, the danger presented, as distinguished from the harm actually caused by an offense. For instance, whether a defendant possessed a firearm or other dangerous weapon during the commission of a crime — as opposed to brandishing or using it in some way — or whether a defendant conducted more than minimal planning, are facts that go to the danger presented by the defendant without, at least typically, affecting whatsoever the harm actually caused by the crime. Yet sentences are routinely enhanced under the guidelines for just those sorts of circumstances. *See, e.g.*, U.S.S.G. § 2B2.1 (providing, in the burglary guideline, for one two-level enhancement for "more than minimal planning" and another if "a dangerous weapon (including a firearm) was possessed").

Similar concerns seem to underlie § 2B3.2, the guideline at issue here. The provision's Application Notes refer to very generalized types of threats, such as threats "to cause labor problems," U.S.S.G. § 2B3.2, cmt. 2, or to cause death or serious bodily injury to many, as with a plan "to derail a passenger train or poison consumer products." *Id.* at cmt. 7. Such threats are seen as warranting an enhancement

not because additional harm is actually imposed on the intended victims, who will likely be unaware of the threat posed to them, but because the defendant's conduct presented a level of danger beyond that for which the base level of the offense was designed.

Mussayek relies heavily on dicta in *United States v. Rainone*, 32 F.3d 1203 (7th Cir. 1994), as supporting his view that a "threat" has been made only when it has been communicated. In *Rainone*, the Court of Appeals for the Seventh Circuit considered the applicability of the provision at issue here where the defendant made threats to extortion victims that included threats against the victims' family members. *Id.* at 1208. The defendant apparently argued that an enhancement was not justified because the threats against the family members had not been directly communicated to them. *Id.* The court held that it made "no difference that the threats against the members of the families of the extortion victims were not communicated directly to those family members" because the "extortion victims themselves . . . were also threatened with physical injury." *Id.* The mention of the victims' families "merely magnified the threats." *Id.*

In reaching its conclusion that the issue of communication was irrelevant under the facts before it, however, the court commented:

> The guidelines do imply that a threat of which the threatened person remains ignorant is not a basis for an upward adjustment or departure, *see* U.S.S.G. § 2B3.1, Application Note 6; § 2B3.2, Application Note 2; *United States v. Wint*, 974 F.2d 961 (8th Cir. 1992), and there is no indication that the victims of the defendants' extortions told their families about the threats.

*Id.* Notwithstanding the Seventh Circuit's dicta, the authorities cited in *Rainone* in fact provide little support for Mussayek's position here.

First, *United States v. Wint* is completely inapposite. There the Court of Appeals for the Eighth Circuit held only that the circumstances of the threats involved there — ongoing, sincere death threats made against an individual

and his family — were "sufficiently unusual" to warrant an upward departure. *Wint*, 974 F.2d at 971. The court was not presented with any question as to whether threats needed to be communicated under § 2B3.2, nor did it even implicitly address the issue anywhere in the opinion.

Similarly, Application Note 6 of § 2B3.1 is clearly distinguishable. First of all, it pertains to a sentencing enhancement for a different offense characteristic — a "threat of death" — in connection with a different crime, robbery. U.S.S.G. § 2B3.1(b)(2)(F). In addition, the content of the Application Notes under the robbery guideline is very different from the content of the Application Notes under the extortion guideline at issue here. The enhancement for a threat of death during a robbery, for instance, contemplates a situation in which an offender uses phrases like "Give me the money or I will kill you," or "Give me the money or else (where the defendant draws his hand across his throat in a slashing motion)," and courts are explicitly instructed to consider, in deciding whether to apply the enhancement, whether the defendant's conduct would instill a fear of death in a reasonable victim. U.S.S.G. § 2B3.1, cmt. 6. In contrast, the Application Notes actually applicable here reference very generalized threats and "plan[s]," and at no point make any reference to the effect on the potential victim. U.S.S.G. § 2B3.2, cmts. 2, 7. Thus, to the extent that the guidelines might indeed be read to "imply" that a threat of death made in connection with a robbery needs to be communicated, little could be plausibly inferred from that conclusion about the proper application of enhancements under the guideline at issue here.

Application Note 2 of § 2B3.2, on the other hand, at least concerns the correct guideline and enhancement, but the focus of the Note is on the *content* of particular extortionate threats. The Note advises that the sentencing enhancement applies as long as the threat "reasonably could be interpreted as one to injure a person or physically damage property," and includes "any comparably serious threat." U.S.S.G. § 2B3.2, cmt. 2. Nothing in the Note suggests that the threat need be communicated in order to count for enhancement purposes.

In fact, to the extent the Application Notes to § 2B3.2 can be read to address the issue of communication at all, they appear to signal precisely the opposite conclusion. As indicated above, several refer to very generalized threats — causing labor problems, derailing a train, or poisoning consumer products. In factual circumstances involving such threats, the court clearly could not assess the impact of the threats on the intended but unidentifiable victims. The inclusion of such situations, then, within the scope of the guideline, strongly suggests that whether particular intended victims — here, Fogel and Ben Jacob — were aware of the threat is immaterial to the determination of whether a particular threat may be the basis for enhancing a sentence under the guideline.

Indeed, both the guideline and the Application Notes indicate that the key to the application of this enhancement is not, as Mussayek contends, the causation of additional harm to victims, but is, rather, the seriousness of the defendant's conduct, judged by objective standards. The Application Notes advise that the guideline applies whenever "*there was* any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat," U.S.S.G. § 2B3.2, cmt. 2 (emphasis added), and the enhancement is applied for all such offenses that "*involved* an express or implied threat of death, bodily injury, or kidnapping," U.S.S.G. § 2B3.2 (emphasis added). Far from focusing on the causation of actual harm or psychological trauma to the victim, then, the guideline is specifically concerned only with the precise nature of the defendant's conduct. Absent any reference to the intended victim or victims, the guideline differentiates extortionate conduct that involved potential damage to property from similar conduct that involved potential physical violence, and goes on to suggest that an "upward departure may be warranted" when the conduct "involved the threat of death or serious bodily injury to numerous victims." U.S.S.G. § 2B3.2, cmt. 7. Despite Mussayek's contentions to the contrary, such distinctions are wholly logical, evidencing the Sentencing Commission's justified determination that some of those threatening extortion must be punished more

severely than others. As the Court of Appeals for the First Circuit has stated:

> [W]e do not think it seems at all unusual that the Sentencing Commission . . . would choose to distinguish among various types of extortion for sentencing purposes and, accordingly, seek to punish extortionists who employ "express or implied threat[s] of death, bodily injury, or kidnapping," *see* U.S.S.G. § 2B3.2(b)(1), with greater severity than other, less callous, practitioners of the same crime.

*United States v. Jones*, 997 F.2d 967, 969 (1st Cir. 1993). In other words, "the enhancement provision [was designed] specifically to target those who made a bad situation worse by using 'an express or implied threat of death, bodily injury, or kidnapping' as a tool of the extortion trade." *Id.* (quoting U.S.S.G. § 2B3.2(b)(1)).

We can find no reason to limit the meaning of the term "threat" as used in § 2B3.2(b)(1) to contemplate only statements communicated to their intended victims. Here, Mussayek's offense clearly "involved an express or implied threat of death, bodily injury, or kidnapping," U.S.S.G. § 2B3.2(b)(1), and, accordingly, the District Court did not err in applying the threat enhancement.[5]

## II. Enhancement for Preparation to Carry out a Threat of Serious Bodily Injury under U.S.S.G. § 2B3.2(b)(3)(B)

Mussayek next challenges the District Court's application of the enhancement under § 2B3.2(b)(3)(B), based on its conclusion that Mussayek's conspiracy to commit extortion involved the "preparation to carry out a threat of . . . serious bodily injury," or "otherwise demonstrated the ability to carry out such threat." We review the District Court's factual findings for clear error, and accord "due

---

5. The government notes that the jury convicted Mussayek of conspiring to commit extortion, an offense that was charged in the indictment as involving the "wrongful use of actual and threatened force, violence and fear." A use of force could only have been "threatened" if there was a "threat." Thus, it seems that the jury here understood that a "threat" made to someone other than the intended victim is still a threat.

deference" to its application of the guidelines to the facts. *See United States v. Chau*, 293 F.3d 96, 99 (3d Cir. 2002). We agree with the District Court that the enhancement was proper under the circumstances presented here.

The District Court could easily have found that Mussayek did more than merely make a verbal threat, but instead made preparations to carry it out. The court alluded only to the sending of Aharanoff to Israel, but the record contains much more. Mussayek solicited the assistance of the agents and discussed physical violence, including kidnapping Fogel's daughter and breaking the legs of both Fogel and Ben Jacob. Mussayek and the agents met to discuss the plan, and the agents were given physical descriptions and background information. Mussayek paid the agents $5,000 as a down payment, arranged for Agent Calvarese to travel to Israel, and instructed Aharanoff to help Calvarese locate Fogel. In sum, there is overwhelming evidence that Mussayek prepared to "carry out" his threats of serious bodily injury, or that he had otherwise demonstrated the ability to carry them out. *See* U.S.S.G. § 2B3.2(b)(3)(B).

Mussayek argues that policy reasons argue against application of the enhancement because the "preparation" here would never have resulted in any actual extortion, since it was all part of a "sting" operation against him. Again the limitation that Mussayek seeks to impress on the applicability of the guideline is unwarranted. Contrary to Mussayek's view, we see the enhancement for the "preparation" or "ability to carry out" a threat as standing alone, punishing those who do more than merely threaten with death, serious bodily injury, kidnaping or product tampering. Under the plain language of the guideline, it matters not whether a particular extortion conspiracy is ultimately unsuccessful because it was thwarted, botched, or simply abandoned after a remorseful offender's change of heart; the guideline asks only whether "the offense involved preparation to carry out" the threat, or whether "the participant(s) otherwise demonstrated the ability" to carry it out. As noted above, there was certainly sufficient evidence in the record to satisfy that standard, and, accordingly, we

can find no error in the District Court's application of the enhancement.[6]

### III. Downward Departure for Victim Provocation under U.S.S.G. § 5K2.10

Finally, we turn to the District Court's refusal to depart downward for victim provocation under § 5K2.10. If a district court's ruling is based on the belief that a departure was legally impermissible, and, thus, involves an issue of law, we have jurisdiction to review. *See, e.g., United States v. Marin-Castaneda*, 134 F.3d 551, 554 (3d Cir. 1998). Here, it is clear that the District Court concluded that the departure did not fit this situation and was thus impermissible.[7]

---

6. As the District Court pointed out, the offense conduct here was conspiracy to commit extortion, not extortion itself, so the completion of the threat in the form of actual extortion was not at issue.

7. The District Court stated:

[A]t the end of the day when you read the language of this departure, when you read the language of this victim conduct provision, they are talking about something that is more directly provocative, contributed to the danger presented. That's the language. And I think that language connotes an immediate, if not perhaps even physical provocation and not what we have in this case.

. . . .

[W]hen you read this provision 5K2.10, you get a sense of a more direct physical danger, relevant physical characteristics, size and strength of the victim, persistence of the victim's conduct and efforts by the defendant to prevent confrontation, danger reasonably perceived by the defendant, by the victim's reputation for violence, danger presented to the defendant by the victim.

That was not this case. In this case the redress that would be appropriate would be a lawsuit, a resort to a report to the police. That's the kind of conduct that would be expected for a person in the defendant's position to take against these two people, Ben Jacob and Fogel.

. . . .

I think you would have a better argument on the range, the application where within the range this defendant should be sentenced, but I don't think you have sufficient to draw the application of this, what I read as the departure conceived of by this provision.

Section 5K2.10 provides that departures may be made where "the victim's wrongful conduct contributed significantly to provoking the offense behavior." U.S.S.G. § 5K2.10. It then instructs:

> In deciding the extent of a sentence reduction, the court should consider: a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant; b) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation; c) the danger reasonably perceived by the defendant, including the victim's reputation for violence; d) the danger actually presented to the defendant by the victim; and e) any other relevant conduct by the victim that substantially contributed to the danger presented.

*Id.* In addition, the guideline indicates that victim provocation departures are most often applicable when the defendant's offense behavior was of a violent nature, but also provides that there may be "unusual circumstances" in which "substantial victim misconduct," such as "an extended course of provocation and harassment," could justify a departure even in the case of a non-violent offense such as theft or the destruction of property. *Id.*

We have previously noted that departures are most clearly "contemplate[d] . . . where the victim's conduct posed actual, or reasonably perceived, danger to the defendant, with an emphasis on physical danger," and that "[g]enerally only violent conduct . . . justifies a downward departure." *United States v. Paster*, 173 F.3d 206, 211 (3d Cir. 1999). Yet neither our court, nor the guidelines themselves, restrict departures to situations involving violence or physical danger. *See, e.g.*, *United States v. Harris*, 293 F.3d 863, 872-73 (5th Cir. 2002). The key to the viability of a claim for a downward departure for victim provocation appears to depend on the unique facts of each case regarding whether the requisite provocation existed.

As cases applying § 5K2.10 focus on whether, under particular circumstances, the victim's misconduct contributed significantly to provoking the defendant's specific offense behavior, the starting point must be the

careful consideration of "all of the circumstances" of the encounter in question. *Paster*, 173 F.3d at 211. Exemplifying this principle is the Supreme Court's decision in *Koon v. United States*, 518 U.S. 81 (1996). *Koon* arose out of the Rodney King excessive force incident that occurred in Los Angeles in 1991. Notably, the District Court had made a factual finding that at the time the defendants actually crossed the line from lawful conduct to unlawful, excessive force — the offense behavior in question — King no longer "posed [an] objective threat, and the defendants had no reasonable perception of danger." *Id.* at 102. Yet the Supreme Court affirmed the downward departure for victim provocation. The Court stated that it "would be a startling interpretation and contrary to ordinary understandings of provocation" to find that King's extended course of misconduct — which included "driving while intoxicated, fleeing from the police, refusing to obey the officers' commands, attempting to escape from police custody, etc." — provoked the officers "lawful force but not the unlawful force that followed without interruption." *Id.* at 102, 104. "A response," the Court noted, "need not immediately follow an action in order to be provoked by it." *Id.* at 104. Although King was eventually subdued, the overall atmosphere remained volatile, and the officers' offense behavior "followed within seconds" of King's misconduct, during the course of a "dynamic arrest situation." *Id.* at 102, 104. Taking into account all of these circumstances, the Court held that the District Court did not err in holding that King's wrongful conduct contributed significantly to provoking the officers' excessive force, and granting a downward departure accordingly. *Id.* at 104-05.

The precise contours of the departure, however, are difficult to define. It does appear that the mere fact that the victim's misconduct was a *cause* of the defendant's offense behavior, in the sense that the offense behavior may not have been committed but for the victim's conduct, is not enough; downward departures are authorized under the guideline only where the victim's misconduct "contributed significantly to provoking" the defendant's offense behavior. *Cf. United States v. Corrado*, 304 F.3d 593, 615 (6th Cir. 2002) (noting distinction between a "but-for cause" and provocation). We perceive the distinguishing factors to lie in

the specific nature of both the victim's misconduct and the defendant's offense behavior, and the precise nature of the relationship between the two. To that end, it is useful to focus on the straightforward meaning of the term "provocation" itself, as provocation necessarily involves a distinct element of incitement, arousal, or the like. *See Black's Law Dictionary* 1225 (6th ed. 1990) ("The act of inciting another to do a particular deed. That which arouses, moves, calls forth, causes, or occasions. Such conduct or actions . . . as tend to arouse rage, resentment, or fury . . . ."); *cf. United States v. LeRose*, 219 F.3d 335, 340 (4th Cir. 2000) (indicating a lack of provocation where the victim "in no way goaded" the defendant's specific offense behavior).

In addition, courts have often relied heavily on the concept of proportionality, that is, that the necessary provocation only exists if the provoked offense is proportional to the provoking conduct. This reasoning makes sense, as it would be exceedingly difficult to apply § 5K2.10 to a situation in which the offense behavior was excessively disproportional to the victim's misconduct.

The need for proportionality in the response is "evidenced by the factors that § 5K2.10 instructs the courts to consider," including the efforts made by the defendant to avoid confrontation, and the danger actually presented or reasonably perceived to be presented by the victim. *United States v. Morin*, 80 F.3d 124, 128 (4th Cir. 1996). Further, § 5K2.10 explicitly connects the victim's misconduct not just to the defendant's response in a broad sense, but to the defendant's specific offense behavior. As the Fifth Circuit has noted, " 'the offense behavior' is an important phrase" as "it signifies that there is a relationship between the type of offense behavior and the type of victim misconduct that would 'contribute[ ] significantly to provoking' it." *Harris*, 293 F.3d at 872-73. In short, certain less serious victim misconduct may be sufficient to provoke some types of lesser offense behaviors, but insufficient to provoke more severe conduct on the part of the defendant. *See, e.g., id.* at 872-74.

In *Paster*, for instance, we considered the disturbing case of a defendant who viciously stabbed his wife to death soon

after she divulged a number of extramarital affairs. In the District Court the defendant sought, unsuccessfully, a downward departure under § 5K2.10. *Paster*, 173 F.3d at 210-11. Taking into account "all of the circumstances" — such as the defendant's initiation of the fatal confrontation, the fact that his wife posed no reasonable threat as he attacked her when she was emerging from the shower, and that the defendant already knew that his wife was unfaithful — we found "ample record evidence to support" the District Court's denial of a downward departure. *Id.* at 211-12 & 212 n.3. Even if the wife's infidelities constituted misconduct, and even if that misconduct could have prompted some response by the defendant, the defendant's offense behavior — the brutal murder of his unarmed wife — "was grossly disproportionate to any provocation." *Id.* at 212.

Several of our sister Courts of Appeals have also explicitly expressed a concern for proportionality. The Court of Appeals for the Fifth Circuit, for example, has recently held, in a thoughtful and persuasive discussion of the issue, that "[t]aken as a whole, Section 5K2.10 evinces a concern that the offense behavior be not excessively disproportionate to the provocation." *Harris*, 293 F.3d at 873. Similarly, in *United States v. Blankenship*, 159 F.3d 336 (8th Cir. 1998), the Court of Appeals for the Eighth Circuit stated that § 5K2.10 "manifests a concern for proportionality in the defendant's response," and held there that the defendant's claim for a departure was meritless since his "response was disproportionate to the threat posed by the victim's conduct." *Id.* at 339; *id.* ("[The defendant's] response . . . simply was not proportionate to the threat."); *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990) (stating that "[a] concern for the proportionality of the defendant's response is manifested by the terms of § 5K2.10" and reversing the District Court's downward departure). The Court of Appeals for the Fourth Circuit also agrees. *See Morin*, 80 F.3d 124 at 128.

Turning to the facts at hand, Mussayek characterizes the District Court's interpretation of § 5K2.10 as overly narrow and as holding as a matter of law that to qualify the victim provocation must be "immediate" and "physical." But

Mussayek does a disservice to the District Court's thoughtful analysis. The District Court did in fact concern itself with the specific nature and relationship of the victim misconduct and offense behavior at issue here, as the guideline requires, and found that Mussayek's conspiracy to commit extortion was not provoked by the two acts of swindling in the way contemplated by the departure provision. The Court concluded that there was a lack of immediacy and that Mussayek's response was not proportional, noting, for example, that "[i]n this case the redress that would be appropriate would be a lawsuit, a resort to a report to the police. That's the kind of conduct that would be expected for a person in the defendant's position to take against these two people, Ben Jacob and Fogel."

We agree with the District Court that the circumstances here simply do not evidence provocation as required by § 5K2.10. Mussayek was the apparent victim of Fogel's fraud, and Ben Jacob's unethical — at the very least — behavior with regard to their partnership. But there is no evidence that Fogel or Ben Jacob somehow *provoked* Mussayek into attempting to extort money from them. Any wrong done to him was economic in nature,[8] and took place without the immediacy, or the highly-charged context of

---

8. We note two other cases in which the supposed provocation was essentially economic in nature. In *United States v. Bigelow*, 914 F.2d 966 (7th Cir. 1990), the Court of Appeals for the Seventh Circuit reversed the District Court's grant of a departure for victim provocation where the defendants were convicted on extortion and related charges for a number of threats made to the victim arising out of the victim's failure to satisfy a debt. *Id.* at 969, 975. The court held that the victim simply had not provoked the defendants' extortion of him as contemplated by § 5K2.10. *Id.* at 975. By contrast, in *United States v. Dailey*, 24 F.3d 1323 (11th Cir. 1994), the Court of Appeals for the Eleventh Circuit upheld the District Court's grant of a departure where the defendant was convicted of making a single threatening phone call after an individual defrauded him of tens of thousands of dollars. *Id.* at 1324, 1328. The court there was unwilling, under a clear error standard, to reverse the District Court's finding that the defendant's conduct had been provoked. *Id.* at 1327-28. These contrary results only amplify the conclusion that each § 5K2.10 case must be decided on its particular facts. *See, e.g., Dailey*, 24 F.3d at 1327-28 (distinguishing *Bigelow* on its facts).

tension, emotional build-up, or arousal, that typically exemplifies the provocative situation. *See Black's Law Dictionary*, 1225 (6th ed. 1990) (defining provocation); *Paster*, 173 F.3d at 211-212 (affirming that no departure is available where the defendant brutally murdered his unarmed wife after she divulged her infidelity); U.S.S.G. § 5K2.10 (stating that an "extended course of provocation and harassment" could justify a departure for nonviolent offense conduct); *see also Koon*, 518 U.S. at 102-105 (upholding departure for excessive force during arrest situation); *Harris*, 293 F.3d at 872-76 (same); *United States v. Tsosie*, 14 F.3d 1438 (10th Cir. 1994) (upholding departure where the defendant fatally stabbed the victim during a physical altercation moments after learning that the victim was having an affair with his wife); *United States v. Yellow Earrings*, 891 F.2d 650 (8th Cir. 1989) (upholding departure where the defendant stabbed the victim immediately after the victim verbally abused and publicly humiliated her); *United States v. DeJesus*, 75 F. Supp. 2d 141, 144-46 (S.D.N.Y. 1999) (granting departure where the defendant set out to attack the victim just after the victim seriously assaulted the defendant's pregnant girlfriend and threatened her life).

Additionally, Mussayek's response took place long after the alleged scams; he did not react within days, or even weeks, but many months — and in the case of Fogel, nearly a year — later. Indeed, the response involved extensive scheming and planning: the discussions with the agents took place over several months, information was gathered about the intended victims, and Aharanoff and Mussayek flew to Israel to conduct what was in essence reconnaissance activity. In short, Mussayek's offense behavior was not, as one court has well put it, "directly responsive to the immediate provocation," but was, rather, the epitome of "a calculated planned response." *DeJesus*, 75 F. Supp. 2d at 146; *see also, e.g., Blankenship*, 159 F.3d at 339 (rejecting claim for departure where the victim started the confrontation but defendant left and later returned with a loaded gun); *Morin*, 80 F.3d at 128 (reversing departure where the defendant made plans to hire someone to murder his lover's husband after learning he was abusing her); *Shortt*, 919 F.2d at 1328 (reversing

departure for a defendant who built a pipe bomb and put it in his wife's lover's truck); *Bigelow*, 914 F.2d at 975 (reversing departure for defendants who made extensive extortionate threats to victim who owed them money).

Further, Mussayek's offense behavior was "grossly disproportionate to any provocation" on the part of his victims. *Paster*, 173 F.3d at 212. It is to be expected that one who suffered the frauds apparently suffered by Mussayek would undertake efforts to recover the money. But we certainly cannot conclude that the District Court erred in finding that Mussayek's conduct — attempting to hire others to threaten, intimidate, kidnap, assault, shoot, and even murder to achieve his ends — was not a proportional response. In response to past economic wrongs, Mussayek committed himself to an extensive plan of extortion, authorizing the use of grave and even deadly force to recover his losses. Essentially, Mussayek now seeks to transform a mere but-for cause of his conduct into significant provocation. The District Court did not err in holding that this is not the type of situation envisioned by § 5K2.10.

## CONCLUSION

The District Court correctly concluded that Mussayek was eligible for sentence enhancements for the content of his threats, and for his preparations to carry out those threats. In addition, it did not err in holding that Mussayek was ineligible for a downward departure for victim provocation. In light of the foregoing, we will AFFIRM.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals for the Third Circuit*